**AMINPOUR & ASSOCIATES**
A.King Aminpour, Esq. (SBN 183534)
Chelsea Grover, Esq. (SBN 306590)
Michael VanGalio, Esq. (SBN 314675)
317 Ash Street
San Diego, California 92101
Phone: (619) 238-1177

**KHASHAYAR LAW GROUP**
Daryoosh Khashayar, Esq. (SBN 236496)
12636 High Bluff Dr., Suite 400
San Diego, California 92130
Phone: (760) 806-4388

ATTORNEYS FOR PLAINTIFFS

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA TOLEDO MARIN, individually and as Executor of the Estate of MARIO TOLEDO GARCIA; KAREN AMERICA TOLEDO OLIVERA, an individual; KIMBERLY TOLEDO OLIVERA, an individual; SERGIO MARTINEZ VALDEZ, an individual; <br> Plaintiffs, <br> VS. <br><br> SEA SHEPHERD CONSERVATION SOCIETY, an Oregon Foreign Nonprofit corporation;' PAUL FRANKLIN WATSON an individual; and DOES 1 through 50, inclusive, <br> Defendants. | Case Number: <br><br> **COMPLAINT FOR:** <br><br> 1. **WRONGFUL DEATH: NEGLIGENCE/GROSS NEGLIGENCE** <br> 2. **PERSONAL INJURY: NEGLIGENCE/GROSS NEGLIGENCE** <br> 3. **WILLFUL MISCONDUCT** <br> 4. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |

**TO ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD:**

COME NOW, Plaintiffs ANGELA TOLEDO MARIN, individually and as Executor of the Estate of MARIO TOLEDO GARCIA; KAREN AMERICA TOLEDO OLIVERA; KIMBERLY TOLEDO OLIVERA; and SERGIO MARTINEZ

VALDEZ; by and through their attorneys of record, and through this Complaint bring an action for damages against Defendants SEA SHEPHERD CONSERVATION SOCIETY, INC. and DOES 1 through 50 as follows:

## PARTIES AND PRELIMINARY ALLEGATIONS

1) Plaintiff **ANGELA TOLEDO MARIN**, (herein "Angela") brings this action individually and on behalf of the Estate of Mario Toledo Garcia. Angela is the older sister of deceased Mario Toledo Garcia (herein "Decedent"); and the aunt of Decedent's daughters, Plaintiffs Karen America Toledo Olivera (herein "Karen") and Kimberly Toledo Olivera (herein "Kimberly") (herein collectively, "Toledo Plaintiffs"). Angela took care of her brother Mario after their mother died and Father died, and has continued to provide cooking and other assistance to him and to his daughters. In turn, Decedent provided financial and household support to Angela, as well as for Karen and Kimberly, prior to his death. Angela brings this action on their behalf and for their benefit. Decedent was at all times before his death and as herein mentioned an individual residing in San Felipe, BCN, Mexico. Angela, Karen and Kimberly are, and at all relevant times have been, individuals residing in San Felipe, BCN, Mexico.

2) This action is brought by Angela in her dual capacities as Decedent's heir at law, in which she individually asserts her claim for his wrongful death on behalf of herself and her deceased brother's children, and as Decedent's successor in interest of the Estate. Her claims asserted in the latter capacity are brought on behalf of the Decedent's Estate as a survival action to recover on claims for which Decedent would have been the named plaintiff and could have recovered damages had he lived.

3) Plaintiff **SERGIO MARTINEZ VALDEZ** (herein, "Mr. Martinez Valdez") is, and at all relevant times has been, an individual residing in San Felipe, BCN, Mexico.

4) Plaintiffs are informed and believe, and thereon allege, that Defendant SEA SHEPHERD CONSERVATION SOCIETY (referred to herein as "Sea Shepherd") is, and at all relevant times has been, a foreign nonprofit corporation founded by Defendant Paul Watson in 1977 and registered in the state of Oregon, which maintains its United States headquarters office in Burbank, California, and which, at all times relevant herein, has engaged in substantial operations in Los Angeles County, within the Central District of California. Sea Shepherd lists, with the California Secretary of State #C1845300, a registered agent for service of process named David J. Hance, 375 W. Alameda Ave, #209 Burbank, CA 91506.

5) Plaintiffs are informed and believe, and thereon allege, that Defendant Sea Shepherd is, and all times relevant herein was, the owner and operator of the *M/V Farley Mowat* ("Farley Mowat"), a United States registered, 110-foot cutter formerly owned by the United States Coast Guard, with a 168-ton displacement and twin diesel engines providing a top speed of 30 knots (56 km/h; 35 mph), (herein, the "Farley Mowat"). The Farley Mowat has at all material times herein sailed under the flag of the United States of America with a United States Registration and a U.S. Coast Guard official number. Plaintiffs are further informed and believe that Sea Shepherd is, and all times relevant herein was, also the owner and operator of the cutter *M/V Sharpie,* (herein, "Sharpie"), a United States registered vessel also sailing under the flag of the United States of America with a United States Registration.

6) Plaintiffs are further informed and believe, and thereon allege, that Defendant PAUL FRANKLIN WATSON (referred to herein as "Paul Watson" or "Watson") is the founder and former CEO of Sea Shepherd Conservation Society and has served as Captain of the Farley Mowat and approximately other 14 vessels owned by Sea shepherd. Plaintiffs are further informed and believe that Watson is, and has at all material times has been, actively involved in establishing and directing

**COMPLAINT FOR DAMAGES**

the policies and procedures followed by Sea Shepherd; as well as actively involved in its various campaigns and operations, including those at issue in this action.

7) The true names or capacities, whether individual, corporate, associate or otherwise of Defendants, DOES 1 through 50, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names, and when the same have been ascertained, the Court will be asked to insert the same by amendment. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated herein as a DOE Defendants was legally responsible in some manner for the events and happenings herein referred to and caused the injuries and damages to Plaintiffs and Decedent as herein alleged.

8) At all times herein mentioned, Defendants Sea Shepherd and Does 1 through 50, inclusive (hereafter collectively referred to as "Defendants"), and each of them, were the agents, servants, or employees of any co- defendants, and acting within the scope and course of said agency and/or with the permission and consent of said co-defendants.

9) Unless otherwise indicated, the use of Defendants' names in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, parents, principals, trustees, sureties, subrogees, representatives and insurers of the named Defendants.

## **JURISDICTION AND VENUE**

10) This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1333 and U.S. Const. Art. III § 2 CL.1, because it sounds in admiralty, involving maritime tort claims arising out of a collision between a United States corporate vessel and a Mexican fishing boat; which occurred in navigable waters and bears a significant relationship to traditional maritime activities.

11)    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there exists complete diversity of citizenship between Plaintiffs (all of whom are residents and citizens of Mexico) and Defendants Sea Shepherd (a nonprofit corporation organized and existing under the laws of the State of Oregon) and Paul Watson (whom Plaintiffs are informed and believe maintains dual Canadian and United States citizenship, presently resides primarily in the state of Vermont, and maintains a principal place of business at 209 E Alameda Ave, Suite 205, Burbank, CA 91502).

12)    This Court has personal jurisdiction over Defendant Sea Shepherd because it maintains its United States headquarters office at 209 E Alameda Ave, Suite 205, Burbank, CA 91502 and has, at all material times, conducted continuous, systematic, and substantial operations in the County of Los Angeles in the Central District of California. Likewise, the Court has personal jurisdiction over Watson because he maintains an office at the United States headquarters of Sea Shepherd in Burbank, California, and has, at all material times, been actively involved in directing and participating in the operations of Sea Shepherd, including those conducted in Los Angeles County, California.   Such operations conducted by Sea Shepherd and Watson include regular support of, and participation in, the campaigns of the M/V Farley Mowat, which was directly involved in the incident giving rise to this action.   Therefore, Sea Shepherd and Watson have sufficient minimum contacts with this state, and otherwise purposely themselves itself of this state so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13)    Venue is proper in this District pursuant to 28 U.S.C. § 1332 because it is a transnational case; and further pursuant to 28 U.S.C. § 1391 for the following reasons: (a) it is the forum most convenient to all parties and witnesses, and a District chosen by Plaintiffs where Defendants Sea Shepherd and Watson are

-5-
**COMPLAINT FOR DAMAGES**

subject to personal jurisdiction; (b) Defendants maintain a headquarters office and regularly conduct business operations in this District as set forth above. Additionally, Plaintiffs are informed and believe that one or more crew members of the Farley Mowat at the time of the subject incident, who may be added as Defendants in this matter as discovery and investigation progress, are residents of this District and subject to personal jurisdiction here.

## **INTRODUCTION**

14)   For more than a century, San Felipe in Baja California, Mexico has existed as a small fishing village on the Upper Gulf of California, where the local economy still depends on fishing, shrimping, and hauling in seafood. San Felipe also depends on tourism and is known for its restaurants featuring locally harvested seafood.

15)   On or before May 17, 2017, Sea Shepherd entered into a Conservation Agreement ("Agreement") with the Mexican Government, establishing the basis and means for collaboration to promote and implement actions for the protection and conservation of wildlife.

16)   On October 25, 2019, at an official signing presided over by Dr. Blanca Mendoza Vera, Mexico's Federal Attorney for Environmental Protection, Sea Shepherd ("Organization") officially entered into a new Agreement with the Mexican Government to support the protection and conservation of marine wildlife in Mexican waters. The Agreement specifically focused on and provided for collaboration between the parties on the removal of phantom fishing nets (often called "ghost nets" and referred to herein as "networks") in the protected marine area, within the nature of biosphere reserve of the high Gulf of California; as well as in the high red river, located in waters of the Gulf of California and the municipalities of Mexicali, Lower California, Puerto Peñasco and San Luis Rio Colorado, Sonora Mexico.

17)   The Agreement provides in pertinent part as follow:[1]

**(A)** That under the Agreement, it is the interest of the parties to collaborate in the removal of abandoned nets within the biosphere reserve of the Upper Gulf of California and the high Colorado River in order to avoid gillnet-caused damage or death to species as important as the vaquita and other at-risk species (Agreement ¶ I.3).

**(B)** "**DECLARES THE ORGANIZATION**"
That [Sea Shepherd] is an international non-profit organization that was established in 1977 under the laws of the state of Oregon, United States of America, dedicated to the conservation of marine life (Agreement ¶ III.1).

_____
**(C)** That Mr. Paul Watson has served as president and chief executive officer since April 6, 2016 (Agreement ¶ III.4).

_____
**(D)** The Organization expresses its willingness to enter into this Agreement for resources that allow for the important work of removing fishing nets that have been lost or abandoned by fishermen in the marine area of the Gulf of California High Biosphere Reserve and the Colorado River reserve, known as ghost nets, to avoid gillnet-caused damage or death of species as important as the sea vaquita or other endangered species. (Agreement ¶ V.3).

**(E) "CLAUSES"**
**First object.** The purpose of this Agreement is the location, reporting and removal of nets that have been lost or abandoned by fishermen in the marine area of the Gulf of California High Biosphere Reserve and Delta Colorado River located in waters of the Gulf of California and municipalities of Mexicali Baja California, Peñasco San Luis Rio Colorado Sonora port; to avoid gillnet-caused damage or death of species as important as the sea vaquita or others considered at-risk species, for which the parties agree to the specifications embodied in this Agreement.

**Second.** From the schedule of activities. In order to comply with the subject matter of this Agreement, the parties agree to provide the material and human support required for the actions arising from this Agreement and to jointly formulate the

_____
[1] The provisions of the Agreement as described herein have been translated, condensed, and paraphrased from the original Agreement, which was in Spanish. A true and correct copy of the Agreement as originally written in the Spanish language is attached hereto as Exhibit A.

schedule of activities to be carried out for the withdrawal of networks in the marine area of the High Gulf California Biosphere Reserve, which shall contain at least the following elements:

(a) Provide relevant information for the location, removal and destruction of networks in coordination with PROFEPA and environmental authorities.

(b) Coordination of the parties' operational actions for the fulfillment of the subject matter of this instrument, programmed in accordance with the "schedule of activities" stipulated in the second clause.

(c) To comply with the requests of the organization and MUBABCS, within the framework of its operational priorities and without affecting other operations being developed, in order to have a presence of its staff on board the vessels of the organization and MUBABCS, when they believe that there are circumstances that compromise the safety of the personnel or such vessels.

**"THE ORGANIZATION"**
(b) Will board your vessels to collect the abandoned networks you locate in the course of the activities referred to in this Agreement.

(c) Once on board, carry out the process of dismantling or destroying the networks for delivery to the corresponding collection center.

18).   The stated goals of Sea Shepherd and Paul Watson, as reflected in the above-described Agreement, are focused on cooperating with the Mexican Government to collect and destroy abandoned networks for the preservation and conservation of marine life and ecosystems and are undeniably laudable.  However, the methods that have been employed by these Defendants in their pursuit of such goals have long demonstrated a profound disregard for human life. Watson has repeatedly bragged about the violent confrontations between Sea Shepherd vessels and other vessels suspected of involvement in activities opposed by Sea Shepherd.19). Plaintiffs are informed and believe and thereon allege that Watson and Sea Shepherd have at all material times maintained a corporate policy of encouraging Sea Shepherd's employees and agents, including the captain and crew of the Farley Mowat, to take a radical, "hard line" approach in pursuit of their mission to stop

others they suspect to be engaged in actions opposed by Sea Shepherd.  They have a documented history and practice of such acts as harassing and intimidating fishers who are lawfully fishing to support themselves and their families, deliberately ramming other vessels, and using devices such as a bow fixture called the "can opener" to gut the hulls of ships and cause them to sink. In his 2002 memoir entitled *Seal Wars*, Watson claimed to have sunk some ten ships. Watson's and Sea Shepherd's violent international history is reflected in numerous documented incidents, many of which have led to prosecution by law enforcement agencies in various nations.  Among the most egregious examples occurring prior to the present incident giving rise to this Complaint:

**(A). 1979:** A Sea Shepherd vessel rammed the whaling vessel "Sierra," causing considerable damage.

**(B).  1980:** The IWC, at its meeting in Brighton, United Kingdom, assigned high-level protection to two Canadian Government delegates after Watson threatened to kill them for voting against a moratorium on hunting sperm whales. The delegates were given Royal Canadian Mounted Police protection until their return to Canada.

**(C). 1980:** The "Sierra" was sunk in Lisbon Harbor. Sea Shepherd claimed responsibility. Investigation showed limpet mines were used to blow up the vessel.

**(D).  1981**: Sea Shepherd claimed responsibility for the sinking of the two whaling vessels, Ibsa I and Ibsa II, in the Spanish harbor of Viga.

**(E).  1986:** Sea Shepherd attempted to stop the Faroe Islands pilot whale harvest, with Sea Shepherd activists shooting at Faroe Islands police in an attempt to sink their rubber dinghies. The vessel "Sea Shepherd" was ordered to leave Faroese territorial waters. A police report of October 7, 1986 states: "One of the rubber dinghies was attacked directly by a "Speed Line" rifle. The attack … endangered the lives of the police crewmembers ... and signal flares containing phosphorous were thrown at the police. At a later stage the Sea Shepherd used 'toads' (rotating iron spikes, pointed and sharp at both ends) against the rubber dinghies … petrol was poured over the side of the ship and signal flares were thrown from the 'Sea Shepherd'" in an attempt to set the petrol on fire."

**(F).  1986:** Sea Shepherd claimed responsibility for the sinking of two whaling vessels in Reykjavik, Iceland, and for malicious damage to a whaling station. This act of violence was carried out after Iceland had ***stopped*** whaling in line with the IWC moratorium on commercial whaling.

**(G).  1991:** A US crew member on a Mexican fishing vessel reported that the vessel "Sea Shepherd," some of whose crew were armed with rifles, rammed his vessel, causing considerable damage.

**(H).  1991:** Scott Trimmingham, then-president of Sea Shepherd, quit in protest. "We had rules about not hurting anyone, about not using weapons. I left because those rules and that philosophy seems to be changing" (as reported in *Outside Magazine*, Sept. 1991).

**(I).  1992:** Paul Watson admitted to the *Los Angeles Free Weekly* that there were arms on board the vessel "Sea Shepherd." He stated, "We confront dangerous people. As the captain, it is my responsibility to protect the lives of my crew ... Therefore, I have prepared myself for the possibility of defending my crew in a situation that could go never occur, but if it does, I will use firearms to first intimidate and then to defend." (*Los Angeles Free Weekly,* April 24, 1992).

**(J).  1992:** The vessel "Sea Shepherd" made unsuccessful attempts to ram three Costa Rican fishing vessels. In a written complaint to the local authorities, the fishermen reported that the Sea Shepherd crew shot at them with bullets containing a red substance, hitting two of them and causing them great pain.

**(K).  1992:** The Sea Shepherd vessel "Whales Forever" collided with the Norwegian Coast Guard vessel "Andenes" on July 4. Charges were filed against Paul Watson, including negligent navigation, refusal to leave Norwegian waters on orders of the Coast Guard, and transmitting false distress signals.

**(L).  1993:** Paul Watson ordered the crew on board the Sea Shepherd vessel "Edward Abbey" to open cannon fire at a Japanese fishing vessel. Sea Shepherd crew did not carry out the order, but instead fired a shot across the bow of the Japanese vessel. (Yorkshire Television Documentary "Defenders of the Wild – Ocean Rider".)

**(M). 1993:** Paul Watson claimed in an open letter to the people of Norway that Sea Shepherd had sunk eight ships and rammed and damaged a further six vessels. In the same letter, he stated: "The Sea Shepherd Conservation Society is a law-abiding organization. We rigidly adhere to and respect the laws of nature or *lex*

*natura*. We hold the position that the laws of ecology take precedence over the laws designed by nation states to protect corporate interests … the smell of guilt is already a stench in the nostrils of God."

**(N). 1994:** U.S. National Fisheries Institute requests an investigation of Sea Shepherd. "The recent alleged actions against Norwegian fishing vessels constitute a clear case of piracy," it stated in a letter to former US IWC Commissioner James Baker. "Acts of violence against fishermen of any nation cannot be tolerated. Their safety and livelihood could be threatened unless U.S. officials vigorously condemn violence on the high seas."

**(O). 1997**: Paul Watson was arrested by Dutch police at Schiphol Airport in Amsterdam, Netherlands, after Interpol issued a warrant for the 1992 attempted scuttling of the Norwegian combined whaling and fishing vessel "Nybræna". He served 80 days in prison in the Netherlands (the required two-thirds of the 120-day prison sentence handed down by Norway).

**(P). 2000:** Watson campaigned against the Makah people of Northwest United States, and used intimidation to prevent the Makah from carrying out their IWC approved catch of the gray whale.

**(Q). 2002:** Watson tells attendees of the Animal Rights 2002 Conference in Washington DC that if a person dies from one of his actions, he will consider it "collateral damage".

**(R). 2010:** In Malta, a diver loses an arm as the result of a collision between a Sea Shepherd vessel against two tuna boats that were legally fishing.

**(S). 2012:** INTERPOL issued a "Red Notice" for Paul Watson based on an arrest warrant issued by Costa Rican authorities seeking his extradition.  Watson was wanted for prosecution in relation to a charge of "causing a danger of drowning or of an air disaster" in connection with an incident in April 2002. An additional Red Notice was issued for Watson at Japan's request.  He was sought for prosecution by Japan on charges of 'Breaking into the Vessel, Damage to Property, Forcible Obstruction of Business, and Injury' in relation to two incidents that took place on the Antarctic Ocean in February 2010 against a Japanese whaling ship.

**(T). 2015**: Sea Shepherd agreed to pay $2.5 million to the Cetacean Research Institute for disobeying a judicial restriction that prohibited it from approaching or attacking Japanese vessels.

**COMPLAINT FOR DAMAGES**

# **FACTUAL ALLEGATIONS**

20)   On or about December 31, 2020, Decedent Toledo and Mr. Martinez Valdez were legally fishing for shrimp in the Sea of Cortez Upper Gulf of California, approximately 18 to 25 kilometers (10 to 12 nautical miles) off the shore of San Felipe, BCN, Mexico. Both were self-employed fishermen who fished to support themselves and their families. At all relevant times, Decedent Toledo and surviving Sergio Martinez Valdez were in a panga (a small boat used for fishing and powered by an outboard motor), made of fiberglass and approximately 28.5 feet long.  They had two nets and were waiting to bring up the nets up full of shrimp and were constantly circling their shrimp nets in the panga (fishing boat) owned by Omar Barraza Carranza.  Decedent and Mr. Martinez Valdez were aware of several other pangas fishing in the area, as was normal, and had noticed the Farley Mowat with another vessel, the M/V Sharpie, patrolling a significant distance away from their panga.  At no time did Decedent or Mr. Martinez Valdez approach the Farley Mowat or the Sharpie, throw any object at either vessel or their crew, or display any act of aggression toward either vessel or anyone aboard.

21)   While Decedent and Mr. Martinez Valdez continued to maneuver the panga in the same circular motion in the same area, the Farley Mowat, which was still a considerable distance away but within plain sight, approached them at a high rate of speed.  The Farley Mowat continued to accelerate as it came closer to the panga. At no time did it reduce its speed, change its course, or take any evasive action to avoid colliding with the panga.  As the panga continued to circle in a continues motion, the bow of the Farley Mowat struck the port side of the panga with such force that the panga broke apart and was destroyed in seconds, and Decedent and Mr. Martinez Valdez were propelled into the water.

22) As a direct and proximate result of this collision, in which the Farley Mowat rammed Decedent's panga broadside at full speed, both Decedent and Mr. Martinez Valdez suffered serious, life-threatening injuries. Decedent suffered extensive trauma to his abdomen, and his pelvis broke in half.

23) The M/V Sharpie, a cutter class vessel owned and operated by the Sea Shepherd Conservation Society, arrived minutes later. Its crew assisted the Mr. Toledo, leaving the second injured fisherman, Mr. Martinez Valdes, unattended. Thereafter, other fishermen in the area approached the site, removed Mr. Martinez Valdez from the water and began to perform CPR.

24) The Sharpie and crew took charge of the deceased Mr. Toledo, but remained in the Gulf of Mexico water for approximately two hours for unknown reasons. After two hours into the sea, the fisherman approached the Sharpie and begging to the crew to please take Mr. Toledo and Mr. Martinez Valdez to land so they could be transported to a hospital and receive proper medical attention. The Sharpie's crew finally heeded the fishermen's requests and transported the injured fishermen to land. Some of the other fisherman later noticed that the Mexican Police were not arresting the captain of the Farley Mowat or the Sharpie Vessels for the accident and began to throw objects to the police and the vessels as an act of anger.

25) Mr. Toledo was transferred to a hospital in Mexicali for treatment of his abdominal trauma, broken hip, fractured pelvis and other injuries; where he died on January 1, 2021, as the result of traumatic injuries to his abdomen and pelvis. Mr. Martinez Valdez suffered a fractured cranium and other serious injuries to his pelvis, shoulders and lower back, which required treatment in the hospital's Intensive Care Unit (ICU) for over 25 days, and for which he remains at home on bed rest. The full scope and duration of Mr. Martinez Valdez's injuries are not yet ascertainable, but Plaintiffs are informed and believe that they will be permanent and likely disabling.

26) Plaintiffs are informed and believe that the captain and all crew members aboard the Farley Mowat at the time of the above-described incident were employees or agents of Defendant Sea Shepherd; and further, that their acts and omissions as described herein were done deliberately and intentionally and were encouraged or sanctioned by Sea Shepherd. At the time of the incident, Defendants, and each of them, knew and/or should have known that their actions created a foreseeable risk and high likelihood of causing the Farley Mowat to strike the panga, and that such a collision would be highly likely to cause death or great bodily harm to any persons aboard the panga.

27) Prior to the collision, Defendants had ample time and opportunity to stop or slow their speed, change course, or take other steps to protect Plaintiffs from the consequences of their actions and to mitigate against the potential for Decedent and Mr. Martinez Valdez to be killed or injured as a result of the Farley Mowat striking the panga. Yet Defendants failed to exercise this opportunity to protect the life and safety of these individuals.

28) Plaintiffs are informed and believe that video cameras aboard the Farley Mowat captured two separate videos showing the collision between Farley Mowat and the panga from two different angles. One video, which is posted on Sea Shepherd's website, its Facebook page, and numerous other public internet sites, shows approximately eight seconds of actual video footage, taken from a location on or near the bow railing of the Farley Mowat, in which Decedent's panga is visible for approximately three seconds immediately prior to the collision. This video does not show the Farley Mowat's rapid approach toward the area where the panga was circling its nets, and misleadingly suggests that the panga suddenly swerved in front of the Farley Mowat.

(see https://www.facebook.com/watch/?v=893269694816868).

**COMPLAINT FOR DAMAGES**

29) The other video, which is approximately 18 to 20 seconds long, was taken from the bridge above the foredeck of the Farley Mowat. This longer video plainly shows the panga circling at a significant distance from the Farley Mowat, such that the Farley Mowat had more than sufficient time and room to alter its course away from the area where the panga was circling and thereby avoid the collision. Instead, it deliberately continued to maintain a steady course aimed straight toward the panga at a high rate of speed, on a trajectory aimed directly toward the panga— taking no evasive action whatsoever prior to ramming the panga.

30) The longer video was briefly available on various public internet sites shortly after the incident, but subsequently disappeared from nearly all such sites. Plaintiffs are informed and believe that the video was deliberately removed and suppressed by Sea Shepherd in order to conceal its wrongful conduct as it barreled toward and then struck the panga at full speed without taking evasive action.  A "video of the video," taken of a computer monitor showing the longer video, appears to be the only surviving footage.  Plaintiffs are informed and believe that this video is presently accessible on few public internet sites (see, e.g. https://radiofiji.com.fj/fisherman-who-collided-with-boat-in-vaquita-marina-habitat-dies/5198/).

31) Another video, which is approximately 3:00 minutes long, was taken by fisherman and posted live on Facebook on November 21, 2020, shortly before the incident that gave rise to this Complaint.  This video shows crew aboard the Sharpie harassing the fishermen, who are begging the Mexican Government representatives aboard the Sharpie to help them. Moreover, it clearly shows that Sea Shepherd's Sharpie crew was breaching and failing to comply with its cooperative Agreement with the Mexican government, by (among other things) failing to carry out their network removal duties pursuant to the Agreement and instead harassing fishermen.

While not shown in the video, the Sharpie crew also sprayed highly pressurized water at the fishermen, causing several to suffer pain and personal injury. See https://www.facebook.com/watch/?v=3955723191146178

32) Plaintiffs are informed and believe that within approximately 24 hours after the incident giving rise to this Complaint, Sea Shepard had compiled a false account of the incident. It callously and intentionally posted this false account, along with the shorter, misleading video described above, on its website (at https://seashepherd.org/news/collision-at-sea-as-sea-shepherd-vessels-attacked-in-mexicos-vaquita-refuge/) and on its Facebook page (at https://www.facebook.com/SeaShepherdConservationSociety); as well as disseminating the false account and misleading video in press releases to numerous media outlets. A true and correct copy of Sea Shepherd's false account, styled as a press release and printed from its website, is attached hereto as Exhibit B.

33) Among other things, Sea Shepherd's false account of the incident, which was immediately posted and released to numerous public media sources by Sea Shepherd:

**(A).** Falsely represented that the panga occupied by Decedent and Mr. Martinez Valdez was among a group of pangas that allegedly "violently attacked" the Farley Mowat and its crew;

**(B)**. Repeatedly referred to Decedent and Mr. Martinez Valdez as "assailants";

**(C)**. Falsely stated that as the Farley Mowat attempted to leave the scene, Decedent's panga "aggressively swerved in front of the Farley Mowat, crashing directly into the hull…";

**(D)**. Falsely inferred that Decedent and/or Mr. Martinez Valdez bore full responsibility for causing the collision between the panga and the Farley Mowat;

**(E).**   Directly and falsely inferred that Decedent and Mr. Martinez Valdez were engaged in illegal fishing, poaching, piracy, assault, and other criminal behavior at the time of the incident.

34)   On or about February 4, 2021, Defendant Paul Watson was interviewed by podcast host Robert Timmons for his popular "Robert Timmons Show" Podcast, which is aired on multiple public media outlets.   See https://hwcdn.libsyn.com/p/a/1/9/a19d2608d8b0ce52/Podcast_Paul_Watson_POD .mp3?c_id=94718228&cs_id=94718228&destination_id=2057192&expiration=1 615592289&hwt=e243960bdfe0eea141e0429f497c9eb3   Watson discussed the incident his interview (commencing at about 16:20 minutes into the discussion) and among other things:  **(A).**     Falsely represented that the panga occupied by Decedent and Mr. Martinez Valdez was part of a group of pangas that allegedly attacked the Farley Mowat by throwing Molotov cocktails, rocks and iron bars at the vessel;

**(B)**.   Repeatedly referred to Decedent and Mr. Martinez Valdez as "poachers" and inferred that they were among a group of poachers backed by violent drug cartels;

**(C)**.  Falsely stated that as the Farley Mowat attempted to leave the area, it was pursued by "poachers," including Decedent and Mr. Martinez Valdez, who "decided to really intimidate" the Farley Mowat and zoomed across its bow, miscalculated, and rammed their boat into Sea Shepherd's vessel.

**(D)**.   Falsely inferred that Decedent and/or Mr. Martinez Valdez bore full responsibility for causing the collision between the panga and the Farley Mowat.

**(E)**.   Falsely stated that the incident was "completely unavoidable, that captain of the Farley Mowat could not have done anything to prevent the incident, and that it was outside of Sea Shepherd's control (See Minute 16:20 forward).

35) At the time Defendants created and disseminated the above-described statements and inferences, they knew or should have known that all such statements and inferences were patently false.  Plaintiffs are informed and believe

that Defendants did so for the purpose of misleading the public, protecting their image, and concealing their own misconduct and culpability for Decedent's death, Mr. Martinez Valdez's injuries, and Plaintiffs' other damages.

36)  Plaintiffs are informed and believe and thereon allege that Defendants have at all material times maintained a longstanding corporate policy and procedure of condoning and/or encouraging Sea shepherd's employees and agents, including the captain and crew operating the Farley Mowat on the date of the subject incident, to take a radical, "hard line" approach in pursuit of their mission to stop others they suspect to be engaged in actions opposed by Sea Shepherd.  They have a documented history and practice of such acts of recklessness and violence, including harassing and intimidating of fishers who are lawfully fishing to support themselves and their families, deliberately ramming or taking other steps designed to sink other vessels, and using other tactics in such a manner as to cause injury and endanger human lives (as described in more detail above).

37)  Plaintiffs are further informed and believe that Defendants were aware of the unreasonably dangerous conditions caused by the conduct of its captain and crew aboard the Farley Mowat prior to and at the time of the incident at issue here, including recklessly and intentionally approaching fishing boats such as Decedent's panga at high and unsafe speeds for purposes of harassment and intimidation, which conduct Sea Shepherd regularly and customarily condoned and encouraged. It was reasonably foreseeable that such conduct would cause death or injury.

38)  Decedent's wrongful death, the serious injuries suffered by Mr. Martinez Valdez, the destruction of personal property; as well as Plaintiffs' other damages and harm suffered as set forth herein, were all legally and proximately caused by Defendants' acts and omissions complained of; including but not limited to Defendants' policies and procedures as described above; their failure to comply with the applicable laws, regulations, and rules governing the operation of vessels

under the circumstances existing at the time of the subject incident; and its other negligent, grossly negligent, and intentional conduct described herein.

39) As a legal and proximate result of the negligence, gross negligence, and/or intentional conduct of Defendants as set forth herein, Decedent's Estate incurred damages, including reasonable and necessary medical and hospital expenses, the severe and conscious fear and pain, severe emotional distress, and loss of enjoyment of life suffered by Mr. Toledo prior to his death; and costs incurred to replace the panga and fishing equipment destroyed by Defendants.  Such damages are requested by Angela as Decedent's successor in interest, on behalf of the Decedent's Estate.

40) As a further legal and proximate result of the negligence, gross negligence, and/or intentional conduct of Defendants as set forth herein, the Toledo Plaintiffs have incurred and will incur economic damages (recoverable in accordance with the Death on the High Seas Act [DOHSA]), including but not limited to loss of the financial support previously provided by Decedent, loss of Decedent's ability or potential to earn money in the future, loss of Decedent's household services, medical and hospital expenses not paid by the Estate or otherwise covered, funeral expenses, loss of inheritance, and loss of Decedent's care, nurture, and guidance of the children; together with interest thereon from the date of the subject incident. The Toledo Plaintiffs are entitled to recover damages from Defendants in a sum sufficient to compensate them for all such losses, to be determined according to proof at trial.

41) As a legal and proximate result of the negligence, gross negligence, and/or intentional conduct of Defendants as set forth herein, Mr. Martinez Valdez has incurred and will continue to incur economic and non-economic damages, including but not limited to past and future medical and health care expenses reasonable and necessary for the treatment of his injuries as causally related to Defendants' wrongful conduct (including but not limited to charges incurred for

physicians, surgeons, medications, hospital costs, physical therapy, disability assistance, and other past and future medical expenses); out of pocket expenses related to such medical treatment and needs, loss of past and future income, lost earning capacity and future earnings, loss of ability to perform  household services; damages for past and future physical and mental pain and suffering, emotional trauma, loss of independence, loss of enjoyment of life, disability, disfigurement,; together with interest thereon from the date of the subject incident. Plaintiffs will continue to incur like expenses in the future of an unknown amount. Mr. Martinez Valdez is entitled to recover damages from Defendants in a sum sufficient to compensate him for all such losses, to be determined according to proof at trial.

42) Because Defendants committed intentional wrongful acts, which were done willfully, maliciously, and despicably as more fully set forth below, all Plaintiffs herein are also entitled to recover punitive damages from Defendants.

### FIRST CAUSE OF ACTION:
### WRONGFUL DEATH:  NEGLIGENCE/GROSS NEGLIGENCE
### *(By the Toledo Plaintiffs Against All Defendants)*

43)  Plaintiffs incorporate herein all preceding and subsequent paragraphs as though fully set forth at this point.

44)  The Toledo Plaintiffs' Wrongful Death action arises under and is governed by the Death on the High Seas Act (DOHSA), 46 USC § 30301 et seq.

45)  Plaintiffs are informed, believe and thereon allege that Defendant Sea Shepherd owned, managed, controlled, operated, inspected, and maintained the vessel Farley Mowat at all times relevant herein.

46)  Plaintiff are informed, believe and thereon allege that Defendant Sea Shepherd was the owner and operator of the Farley Mowat, and that Sea Shepherd employed and/or maintained an agency relationship with all persons aboard the Farley Mowat, including all who participated in the driving, navigation, and operation of

the vessel prior to and at the time of the subject incident; which they did within the course and scope of employment and/or agency.

47) Defendants, and each of them, had a duty to exercise reasonable care and prudent seamanship under the circumstances when operating Sea Shepherd vessels, including the Farley Mowat.  This included a duty to manage and operate such vessels in a reasonably safe manner so as to avoid causing damage, injury or death to persons aboard other vessels in the vicinity of the Farley Mowat, including the particular injuries suffered by the Decedent and Plaintiffs herein.

48) Defendants breached their duty to the Toledo Plaintiffs by operating the Farley Mowat at a speed that was unreasonably unsafe under the conditions and circumstances which existed immediately prior to and at the time of the incident, and further by failing to slow or stop the vessel to avoid collision, damage, and injury to individuals aboard Decedent's panga.

49) Defendants further breached their duty to the Toledo Plaintiffs by failing to keep a reasonable lookout for other vessels, and by failing take any evasive action to avoid the broadside collision that occurred when the Farley Mowat struck the panga upon detecting its presence directly in the Farley Mowat's path of travel.

50) Defendants further had a duty to train, supervise, and manage the employees and agents of Sea Shepherd in a manner consistent with their legal duties owed, and in compliance with all applicable laws, rules, and regulations.

51) Defendants breached their duty to the Toledo Plaintiffs by failing to properly train, supervise, or manage the employees and agents of Sea Shepherd in accordance with its legal duties and the applicable law; or to implement, institute and/or enforce rules, standards, and/or training to prevent incidents such as the one that occurred here.

52) Defendants also had a duty to ensure that Sea Shepherd's vessels and employees/agents complied with all applicable statutes, regulations and rules governing the minimum fitness of the vessels and crews, as well as the navigation

of the vessels; including but not limited to the International Regulations for Prevention of Collisions at Sea, 33 U.S.C. foll. §1602 (commonly called the "International Rules," "Rules of the Road," or "COLREGS," and referred to herein as the "Rules"). These Rules impose statutory duties upon all vessels, owners and operators to which they apply, including Defendants and the Farley Mowat.

53) Among other requirements imposed by the Rules, Defendants, and each of them, was legally bound to abide by the following:

**(A)** Rule 5: "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."

**(B)** Rule 6 (in pertinent part): "Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions. In determining a safe speed, the following factors shall be among those taken into account: (a) By all vessels: (i) the state of visibility; (ii) the traffic density including concentrations of fishing vessels or any other vessels; (iii) the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions…"

**(C)** Rule 7 (in pertinent part): "(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist…(d) In determining if risk of collision exists the following considerations shall be among those taken into account: (i) such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change; (ii) such risk may sometimes exist even when an appreciable bearing change is evident, particularly when…approaching a vessel at close range."

**(D)** Rule 8 (Captioned "Action to Avoid Collision" provides in pertinent part): "(a) Any action taken to avoid collision shall be taken in accordance with the Rules of this Part and shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship…(c) If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation. (d) Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action shall be carefully checked until the other vessel is finally past and clear. (e) If necessary, to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion…"

**(E)** Rule 18 (in pertinent part): "…(a) A power-driven vessel underway shall keep out of the way of: (i) a vessel not under command; (ii) a vessel restricted in her ability to maneuver; (iii) a vessel engaged in fishing…".

54)       As set forth herein, Defendants violated each and every one of the aforementioned Rules, by breaching their duties to maintain a proper lookout (Rule 5), to proceed at a safe speed so as to avoid collision (Rule 6), to determine the risk of collision (Rule 7), to take action to avoid colliding with another vessel including by reducing their speed (Rule 8), and to keep out of the way of a vessel engaged in fishing (Rule 18).

55)       Under the long-established "Pennsylvania Rule" recognized in the maritime law of the United States, if a vessel is in violation of a statutory or regulatory provision designed to prevent collisions at the time of a collision, the vessel owner bears the burden of proving not only that the statutory violation did not cause the collision, but also that it ***could not have contributed*** to the collision. Given Defendants' failure to comply with applicable industry standards, statutes, and Rules

as set forth herein; including the numerous Rule violations described above; the Pennsylvania Rule is invoked and shifts the burden of proof at trial to Defendants to prove that their violations were not a contributing cause of the collision and resulting damages incurred by Plaintiffs.

56)     Moreover, in breaching the above-referenced Rules, Defendants violated statutory mandates designed to prevent precisely the type of incident that occurred— collisions with other vessels—and adopted to protect a class of persons including the Decedent and Mr. Martinez Valdez —individuals who own, operate, or are aboard other vessels (as well as others who may foreseeably suffer harm as a result of such incidents).  Defendants' violation of these Rules proximately caused injury to Mr. Martinez Valdez and to Decedent and his property, as well as to the other Plaintiffs herein.  Accordingly, Defendants' acts complained of amount to negligence per se.

57)     Defendants' acts and omissions as described herein constitute intentional failures to perform manifest duties, in reckless disregard of the consequences as affecting the life and property of others; indicating such a gross want of care and regard for the rights of others as to justify a presumption of willfulness and wantonness.  Accordingly, Defendants' acts complained of herein amount to gross negligence.

58)     As an actual, direct and proximate result of Defendants' negligent, grossly negligent, and/or intentional acts and omissions as alleged herein, the Farley Mowat struck the Panga occupied by Decedent and Mr. Martinez Valdez; proximately causing severe personal injury to Decedent which resulted in his death; the damages suffered by Decedent prior to his death, and the Toledo Plaintiffs' damages suffered as the result of their husband and father's wrongful death.

59)     Accordingly, Angela as successor in interest seeks economic and non-economic damages on behalf of Decedent's Estate for damages sustained by Decedent prior to his death; and the Toledo Plaintiffs individually seek all economic and other available damages under DOHSA arising out of the wrongful death of

their brother and father; along with punitive damages based on Defendants' intentional, malicious, and despicable conduct; all in amount to be determined according to proof at trial.

**SECOND CAUSE OF ACTION:**
**PERSONAL INJURY: NEGLIGENCE/GROSS NEGLIGENCE**
*(By Mr. Martinez Valdez Against All Defendants)*

60)     Plaintiffs incorporate herein all preceding and subsequent paragraphs as though fully set forth at this point.

61)     As described in Plaintiffs' allegations set forth herein, and particularly in the Cause of Action directly preceding, Defendants, and each of them, had a duty to exercise ordinary reasonable care and prudent seamanship in the operation of Sea Shepherd vessels, including the Farley Mowat.  This included a duty to manage and operate such vessels in a reasonably safe manner so as to avoid causing damage, injury or death to persons aboard other vessels in the vicinity of the Farley Mowat, including the particular injuries suffered by the Valdez Plaintiffs herein.

62)     Defendants, and each of them, breached their duty to the Valdez Plaintiffs by their acts and omissions including, but not limited to:  (A) operating the Farley Mowat at a speed that was unreasonably unsafe under the conditions existing immediately prior to and at the time of the incident; (B) failing to slow or stop the vessel to avoid collision, damage, and injury to individuals aboard the subject panga; (C) failing to keep a reasonable lookout and failing take evasive action to avoid the broadside collision that occurred when the Farley Mowat struck the panga; (D) failing to properly train, supervise, and manage Sea Shepherd employees and agents in accordance with their legal duties; or to  implement, institute and/or enforce rules and standards so as to prevent incidents such as the one that occurred here; (E) failing to ensure that its vessel and employees/agents complied with all applicable statutes, regulations and rules governing the minimum fitness of the vessel and crew, as well as the navigation of the vessel; including but not limited to the International

Regulations for Prevention of Collisions at Sea ("Rules"); including Rules 5, 6, 7, 8, and 18 as set forth above, all of which they violated.

63)     As more fully set forth above, Defendants' violation of these statutory Rules, which proximately caused injury to Mr. Martinez Valdez and to Decedent, as well as to the other Plaintiffs herein, amount to negligence per se.

64)     Moreover, given the facts of this matter as set forth herein, including the numerous statutory Rule violations described above, the Pennsylvania Rule applies here, and the parties' burdens of proof must be applied accordingly, as set forth above.

65)     Defendants' acts and omissions as described herein amounted to a series of negligent, grossly negligent, and/or intentional failures to perform manifest duties in reckless disregard of the consequences as affecting the life or property of others; indicating such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness; therefore, rising to the level of gross negligence.

66)     As an actual, direct and proximate result of Defendants' negligent, grossly negligent, and/or intentional acts and omissions as alleged herein, the subject panga, with Mr. Martinez Valdez aboard, was struck broadside by the Farley Mowat; proximately causing severe personal injury to Mr. Martinez Valdez which resulted in his suffering the economic and non-economic damages as described herein.

67)     Accordingly, the Mr. Martinez Valdez seeks all of his economic and non-economic damages arising out of the personal injuries and other he harms sustained as a proximate result of Defendants' acts and omissions as set forth herein; along with punitive damages based on Defendants' intentional, malicious, and despicable conduct; all in amount to be determined according to proof at trial.

**COMPLAINT FOR DAMAGES**

### THIRD CAUSE OF ACTION:
### WILLFUL MISCONDUCT
#### *(By All Plaintiffs Against All Defendants)*

68)     Plaintiffs incorporate herein all preceding and subsequent paragraphs as though fully set forth at this point.

69)     Defendants intentionally, willfully, wantonly, recklessly, and with conscious disregard for the health and safety of Decedent and Plaintiffs; breached their duties owed to Plaintiffs and Decedent by their conduct as set forth herein. Such conduct includes, but is not limited to:

**(A)** Failing to comply with applicable laws, rules and regulations in the training, monitoring and certification of the crew operating the Farley Mowat;

**(B)** Failing to comply with applicable laws, rules and regulations in operating the subject vessel, particularly those COLREG Rules identified above, with respect to controlling speed and taking evasive action to avoid colliding with other vessels; and instead, wantonly and willfully maintaining or increasing its dangerously high speed while driving the Farley Mowat directly toward the location where the panga, with Decedent and Valdez aboard, continued to circle its shrimp net;

**(C)** Consciously and knowingly failing to take steps to ameliorate the peril created by these breaches and failures as described herein, or to take appropriate action to avoid colliding with the subject panga, despite knowing the peculiar, specific, and foreseeable risks posed to individuals aboard the panga by Defendants' conduct.

**(D)** Encouraging and/or condoning Sea Shepherd employees and agents, including the captain and crew of the Farley Mowat, to take a radical, "hard line" approach in their operations and dealings with others they suspect to be engaged in actions opposed by Sea Shepherd; and maintaining a documented pattern and practice of as harassing and

intimidating fishers in a manner that creates unreasonably dangerous conditions with a high foreseeability of causing death or injury to others; including recklessly and intentionally approaching fishing boats at high and unsafe rates of speed for purposes of harassment and intimidation.

70)     These facts, and the others set forth herein, demonstrate that Defendants and their employees/agents, including the Farley Mowat's captain and crew, had actual knowledge of the wrongfulness of their conduct, actual knowledge of peril to be apprehended under the circumstances existing prior to and at the time the subject incident occurred; and actual knowledge of the high probability that death, injury, and/or other damage to Plaintiffs would be the result of their conduct; yet in spite of such actual knowledge, they intentionally pursued their course of conduct with callous disregard of such known risks and dangers; taking no steps whatsoever to avoid them.

71)     As a direct and proximate result of Defendants' willful misconduct as alleged herein, the Farley Mowat struck the panga with Decedent and Mr. Martinez Valdez aboard, proximately causing Decedent's wrongful death and Mr. Martinez Valdez's severe injuries, as well as all other damages suffered by the Plaintiffs as described herein.

72)     The conduct of Defendants as alleged herein was despicable and was done either intentionally with a specific intent to harm Decedent and Mr. Martinez Valdez; or was done recklessly, willfully, wantonly, oppressively, maliciously, outrageously, with callous disregard of the probable harm to be caused thereby. These acts and omissions complained of were done in conscious and reckless disregard of the safety and rights of others, including Decedent, Mr. Martinez Valdez, and the other Plaintiffs, and constitute an extreme departure from the applicable standards of care and conduct. Plaintiffs are therefore entitled to recover punitive and/or exemplary damages, in an amount appropriate to punish, deter and set an example.

73)     Accordingly, Plaintiffs seeks noneconomic and economic damages as set forth herein; plus, punitive and/or exemplary damages; all in an amount to be determined according to proof at trial.

## FOURTH CAUSE OF ACTION:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (By All Plaintiffs Against All Defendants)

74)     Plaintiffs incorporate herein all preceding and subsequent paragraphs as though fully set forth at this point.

75)     From a period beginning approximately 24 hours after the subject incident and continuing to date, Defendants have publicly made, maintained on their media sites, and disseminated to multiple media outlets, various statements regarding Decedent, Mr. Martinez Valdez, and the incident which are patently false; as more fully described above.

76)     Defendants' public statements repeatedly describing Decedent and Mr. Martinez Valdez as "assailants," falsifying the nature of the incident that led to Decedent's death and Mr. Martinez Valdez's injuries, blaming them for causing the incident; and falsely accusing Decedent and Mr. Martinez Valdez of attacking the Farley Mowat and of other criminal behavior were made without any basis in fact. Defendants either knew that these statements were false at the time they were made, or made such statements recklessly and wantonly without regard for the truth, or for how such statements would impact the families of Decedent and Mr. Martinez Valdez.

77)     Defendants' wrongful acts complained of, including but not limited to the dissemination of false statements as described herein, were so extreme in character and outrageous in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community— particularly since they were made immediately after an incident that killed the Toledo Plaintiffs'

brother and father and gravely injured Mr. Martinez Valdez —and especially considering Defendants' obvious motive of concealing their own misconduct and culpability in causing the incident.

78)     Defendants' extreme and outrageous conduct described herein was done with the intent, or with reckless disregard of the probability, that such conduct would cause Decedent and all Plaintiffs severe emotional distress from the embarrassment, humiliation, and anguish from being falsely accused (or having their brother/father falsely accused) of such tortious, reckless and criminal behavior; especially since Defendants' conduct occurred at a time when Plaintiffs were already suffering the grief and trauma associated with severe injury or the death of a loved one.

79)     Defendants' conduct complained of wrongfully and intentionally inflicted needless emotional distress on Plaintiffs. Plaintiffs have suffered and continue to suffer severe emotional distress and anguish as a direct and proximate result of such conduct, which has resulted in physical manifestations including loss of memory, sickness, exhaustion, anxiety, fatigue, headaches, and depression. Plaintiffs have incurred necessary and reasonable health care costs for the treatment of such conditions and expect that additional costs for such care will be incurred in the future. Plaintiffs' injuries and damages as set forth herein were a direct and proximate result of the intentional conduct of Defendants, entitling them to recover economic and non-economic damages.

80)     The conduct of Defendants as alleged herein was despicable and was done either intentionally with a specific intent to harm Decedent and Mr. Martinez Valdez; or was done recklessly, willfully, wantonly, oppressively, maliciously, outrageously, with callous disregard of the probable harm to be caused thereby. These acts and omissions complained of were done in conscious and reckless disregard of the rights of others, including Mr. Martinez Valdez, and the Toledo Plaintiffs, and constitute an extreme departure from the applicable standards of care

and conduct. Plaintiffs are therefore entitled to recover punitive and/or exemplary damages, in an amount appropriate to punish, deter and set an example.

81)   Accordingly, Plaintiffs seek noneconomic and economic damages as set forth herein; plus, punitive and/or exemplary damages; all in an amount to be determined according to proof at trial.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand and reserve all rights to have this matter tried before a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants, and each of them:

1.   For economic damages in an amount according to proof as provided by the applicable law, together with interest thereon at the legal rate;

2.   For noneconomic damages in an amount according to proof as provided by the applicable law, together with interest thereon at the legal rate;

3.   For punitive damages in an amount sufficient to deter others from like conduct;

4.   For costs of suit incurred herein; and

5.   For such other and further relief as the Court may deem just and proper.


Dated:        March 24, 2021                    KHASHAYAR LAW GROUP


                                                *Daryoosh Khashayar*
                                                _____
                                                DARYOOSH KHASHAYAR, ESQ.
                                                Attorneys for Plaintiffs

-31-
**COMPLAINT FOR DAMAGES**

EXHIBIT A

   

**CONVENIO ESPECÍFICO DE COLABORACIÓN PARA EL RETIRO DE REDES FANTASMA, EN LO SUCESIVO "LAS REDES" EN EL ÁREA NATURAL PROTEGIDA, CON EL CARÁCTER DE RESERVA DE LA BIÓSFERA, ALTO GOLFO DE CALIFORNIA Y DELTA DEL RÍO COLORADO, UBICADA EN AGUAS DEL GOLFO DE CALIFORNIA Y LOS MUNICIPIOS DE MEXICALI, BAJA CALIFORNIA, PUERTO PEÑASCO Y SAN LUIS RÍO COLORADO, SONORA, QUE SUSCRIBEN LA SECRETARÍA DE MARINA, A TRAVÉS DEL C. ALMIRANTE DEL CUERPO GENERAL DIPLOMADO DE ESTADO MAYOR JOSÉ LUIS VERGARA IBARRA, ASISTIDO POR EL CONTRALMIRANTE DEL CUERPO GENERAL DIPLOMADO DE ESTADO MAYOR JOSÉ IGNACIO MORENO DÍAZ, EN SU CARÁCTER DE JEFE DE LA SECCIÓN DE OPERACIONES DEL ESTADO MAYOR GENERAL DE LA ARMADA, EN LO SUCESIVO "LA SEMAR"; LA SECRETARÍA DE MEDIO AMBIENTE Y RECURSOS NATURALES, EN LO SUCESIVO "LA SEMARNAT", A TRAVÉS DEL PROCURADOR FEDERAL DE PROTECCIÓN AL AMBIENTE, GUILLERMO JAVIER HARO BÉLCHEZ, EN LO SUCESIVO "LA PROFEPA"; LA ORGANIZACIÓN SEA SHEPHERD CONSERVATION SOCIETY, REPRESENTADA POR SU PRESIDENTE Y DIRECTOR EJECUTIVO, EL C. PAUL WATSON, CON LA INTERVENCIÓN DEL C. LOCKHART MACLEAN, DIRECTOR DE OPERACIONES Y CAMPAÑAS MARINAS, EN LO SUCESIVO "LA ORGANIZACIÓN"; Y EL MUSEO BALLENERO DE BAJA CALIFORNIA SUR, A.C., REPRESENTADO POR SU PRESIDENTE, EL C. FRANCISCO JAVIER GÓMEZ DÍAZ, EN LO SUCESIVO "MUBABCS", A QUIENES EN CONJUNTO SE LES DENOMINARÁ COMO "LAS PARTES", AL TENOR DE LOS ANTECEDENTES, DECLARACIONES Y CLÁUSULAS SIGUIENTES:**

### ANTECEDENTES

I.   Con fecha 10 de junio de 1993, se publicó en el Diario Oficial de la Federación, el Decreto Presidencial por el que se declara como área natural protegida, con el carácter de Reserva de la Biosfera, la región conocida como el Alto Golfo de California y Delta del Río Colorado, ubicada en aguas del Golfo de California y los municipios de Mexicali, Baja California, Puerto Peñasco y San Luis Río Colorado, Sonora, por poseer esta zona un valor biológico único, ya que en ella se encuentra fauna representativa de las zonas zoogeográficas del Pacífico Este, Caribeña y la Provincia Californiana, en las cuales existen Ciénegas y afloramientos de agua dulce en la Franja Costera y humedales permanentes y representativos del antiguo Delta del Río Colorado, tales como las Ciénegas de Santa Clara y el Doctor; se cuenta con vegetación de gran valor por su biodiversidad, riqueza biológica y alta productividad, zonas de crianza y desove de importantes especies marinas; además de constituir

1



 

el hábitat de aves residentes y migratorias. En esta región habitan también especies marinas y terrestres consideradas como raras, endémicas y en peligro de extinción, como la vaquita marina, la totoaba, el palmoteador de yuma, el pez perrito del desierto de Sonora, entre otras.

II.  Con fecha 25 de septiembre de 2009, se publicó en el Diario Oficial de la Federación, el Aviso por el que se informa al público en general que la Comisión Nacional de Áreas Naturales Protegidas ha concluido la elaboración del Programa de Manejo de la Reserva de la Biosfera Alto Golfo de California y Delta del Río Colorado, ubicada en aguas del Golfo de California y en los municipios de Mexicali, Estado de Baja California, y de Puerto Peñasco y de San Luis Río Colorado, Estado de Sonora.

III.  Con fecha 21 de julio de 2014, **"LA SEMAR"** y **"LA SEMARNAT"**, suscribieron el **"CONVENIO MARCO DE COLABORACIÓN"** para establecer las bases y mecanismos generales, a través de los cuales se implementarán acciones de cooperación para la ejecución de los actos de inspección y vigilancia del Territorio Nacional, tendientes a procurar el efectivo cumplimiento y observancia de la legislación ambiental, para prevenir y evitar los efectos negativos al medio ambiente y los recursos naturales.

IV.  Con fecha 17 de mayo del 2017, **"LA PROFEPA"** y **"LA ORGANIZACIÓN"** suscribieron un **"CONVENIO DE CONCERTACIÓN"** mediante el cual se establecen las bases y mecanismos de colaboración a efecto de fomentar e implementar acciones para la protección y conservación de la vida silvestre, así como, la asistencia técnica para el rescate, recepción, liberación y en su caso, destrucción de los cadáveres de especies silvestres, víctimas de actividades furtivas.

## DECLARACIONES

I.  **DECLARA "LA SEMAR":**

I.1. Que es una Dependencia del Ejecutivo Federal, formando parte de la Administración Pública Federal, de conformidad con lo establecido en el artículo 90 de la Constitución Política de los Estados Unidos Mexicanos, 1, 2, 26 y 30 de la Ley Orgánica de la Administración Pública Federal.

I.2. Que para todos los efectos legales relacionados con el presente Convenio Específico de Colaboración en lo sucesivo el **"CONVENIO ESPECÍFICO"**, señala como domicilio el ubicado en Avenida Heroica Escuela Naval Militar número 861, colonia Los Cipreses, delegación Coyoacán, código postal 04830, en la Ciudad de México.

2



 

**SEMAR**
SECRETARÍA DE MARINA

PROFEPA
PROCURADURÍA FEDERAL DE PROTECCIÓN AL AMBIENTE

I.3. Que, al amparo del **"CONVENIO MARCO DE COLABORACIÓN"**, es interés de **"LA SEMAR"** coadyuvar con **"LAS PARTES**, en las actividades de retiro de **"LAS REDES"** abandonadas dentro de la Reserva de la Biosfera del Alto Golfo de California y Delta del Río Colorado, con la finalidad de evitar el enmalle, daño o muerte de especies tan importantes como la vaquita marina o la totoaba consideradas especies en riesgo.

I.4. De conformidad con lo previsto por el artículo 8, fracción XII, del Reglamento Interior de **"LA SEMAR"**, el C. Almirante del Cuerpo General, Diplomado de Estado Mayor, José Luis Vergara Ibarra, en su carácter de Oficial Mayor de **"LA SEMAR"**, está facultado para celebrar los Convenios y Contratos en que la Dependencia sea parte.

II. **DECLARA "LA PROFEPA":**

II.1. Que **"LA SEMARNAT"**, es una dependencia de la Administración Pública Federal a quien le corresponde, de conformidad con los artículos 26 y 32 Bis de la Ley Orgánica de la Administración Pública Federal, fomentar la protección, restauración y conservación de los ecosistemas, recursos naturales, bienes y servicios ambientales, con el fin de propiciar su aprovechamiento y desarrollo sustentable además de formular y conducir la política nacional en materia de recursos naturales, siempre que no estén encomendados expresamente a otra dependencia; así como en materia de ecología, saneamiento ambiental, agua, regulación ambiental del desarrollo urbano y de la actividad pesquera, con la participación que corresponda a otras dependencias y entidades.

II.2. Que es un Órgano Desconcentrado de **"LA SEMARNAT"**, de conformidad con los artículos 1º, 2º, fracción XXXI, inciso a) y 45 del Reglamento Interior de dicha Secretaría, a quien se le otorga entre otras, la facultad de programar, ordenar y realizar visitas u operativos de inspección, para vigilar y evaluar el cumplimiento de las disposiciones jurídicas aplicables a la restauración de los recursos naturales, a la preservación y protección de los recursos forestales, de vida silvestre, quelonios, mamíferos marinos y especies acuáticas en riesgo, sus ecosistemas y recursos genéticos, bioseguridad de organismos genéticamente modificados, especies exóticas que amenacen ecosistemas, hábitats o especies, el uso y aprovechamiento de la zona federal marítimo terrestre, playas marítimas y terrenos ganados al mar o a cualquier otro depósito de aguas marítimas, las áreas naturales protegidas, a la prevención y

3



 

control de la contaminación de la atmósfera, suelos contaminados por materiales y residuos peligrosos, actividades altamente riesgosas, residuos peligrosos, impacto ambiental, emisión y transferencia de contaminantes, descargas de aguas residuales a cuerpos de aguas nacionales, ordenamiento ecológico y auditoría ambiental, de conformidad con las disposiciones aplicables; así como establecer políticas y lineamientos administrativos para tal efecto, además de salvaguardar los intereses de la población, estimular y fomentar su participación en la vigilancia y cumplimiento de las disposiciones jurídicas ambientales, así como brindar asesoría en asuntos de protección y defensa del ambiente en el ámbito de su competencia, y coadyuvar en la solución de problemas causados por emergencias o contingencias ambientales.

**II.2.1.** Que el Procurador Federal de Protección al Ambiente, **Guillermo Javier Haro Bélchez,** está facultado para suscribir el presente Convenio de Colaboración, en atención a lo dispuesto en los artículos 41, 42, 43 y 45 fracciones XXXIV del Reglamento Interior de **"LA SEMARNAT".**

**II.2.2.** Que para todos los efectos legales relacionados con el **"CONVENIO ESPECÍFICO",** señala como domicilio el ubicado en Camino al Ajusco número 200 piso 8, colonia Jardines de la Montaña, código postal 14210, delegación Tlalpan, en la Ciudad de México.

**II.3.** Que al amparo del **"CONVENIO MARCO DE COLABORACIÓN",** es interés de **"LA SEMARNAT"** conjuntar esfuerzos, acciones y recursos que permitan incidir de manera directa para coadyuvar en la importante tarea de retirar redes de pesca que han sido pérdidas o abandonadas por pescadores que se les conoce como redes fantasma, en la zona marina de la Reserva de la Biósfera Alto Golfo de California y Delta del Río Colorado, para evitar el enmalle, daño o muerte de especies tan importantes como la vaquita marina o la totoaba consideradas especies en riesgo.

**III.   DECLARA "LA ORGANIZACIÓN":**

**III.1.** Que es una organización internacional sin fines de lucro que se constituye en 1977, bajo las leyes del Estado de Oregon, Estados Unidos de América, dedicada a la conservación de la vida marina.

**III.2.** Que tiene por objeto social poner fin a la destrucción del hábitat y al sacrificio de la vida marina en los océanos del mundo con el fin de conservar y proteger los ecosistemas y las especies. Que usa tácticas

4



 

innovadoras de acción directa para investigar y documentar, y toma acciones cuando es necesario demostrar y confrontar actividades ilegales en el mar, salvaguardando la biodiversidad del delicado equilibro de los ecosistemas marinos. **"LA ORGANIZACIÓN"** trabaja para asegurar la supervivencia de los ecosistemas marinos para las futuras generaciones.

**III. 3.** Que el Señor PAUL WATSON, acredita su personalidad como Presidente y Director Ejecutivo, desde el 6 de abril del 2016, mediante el certificado de autorización proporcionado por el C. Peter Rysman, Abogado de la Organización, de fecha 27 de marzo de 2017, en el Estado de Florida EUA, certificado ante el Notario Público KIMBERLY WHITE.

**III.4.** Que el Señor PAUL WATSON, se identifica con su pasaporte, expedido por los Estados Unidos de América.

**III.5.** Que para el cumplimiento de los compromisos derivadas del presente **"CONVENIO ESPECÍFICO"**, para oír y recibir notificaciones señala como domicilio el ubicado en Corregidora número 18, colonia Tlacopac San Ángel, delegación Álvaro Obregón, código postal 01040, en la Ciudad de México.

**IV.   DECLARA "MUBABCS"**

**IV.1** Que es una Asociación Civil constituida al amparo de las leyes de la República Mexicana, bajo la escritura pública 28,568 de fecha 7 de febrero de 1995, otorgada ante la fe del Licenciado Héctor Castro Castro, Notario Público número 7 de la Ciudad de La Paz, Baja California Sur e inscrita en el Registro Público de Comercio bajo el número 77 del volumen "X" (décimo) SC y AC, de fecha 15 de febrero de 2008.

**IV.2.** Que dentro de su objeto social se incluye la investigación biológica de los cetáceos en sus aspectos más relevantes y fundamentales, con el objeto de estimular, apoyar, contribuir y difundir la resolución de los problemas relativos a los cetáceos en México y de ser posible, intervenir en los estudios de aspectos del interés del país, tomando en consideración que los grandes cetáceos se encuentran distribuidos de manera ecológica y no según criterios políticos; y la organización de seminarios, simposios, conferencias y una reunión anual, en la que se presenten trabajos de investigación con temas que se enfoquen a la resolución de problemas de investigación y divulgación de cuestiones

5





 

biológicas e historias relacionadas con todos los tipos de cetáceos, así como de su conservación y manejo racional como un recurso natural.

**IV.3.** Que el C. Francisco Javier Gómez Díaz, cuenta con las facultades legales para celebrar el presente instrumento jurídico, tal y como se acredita con la escritura pública número 94,410 otorgada por el Licenciado Héctor Castro Castro, Notario Público número 7 de la Ciudad de La Paz, B.C.S. y manifiesta bajo protesta de decir verdad que las mismas no le han sido revocadas, limitadas ni modificadas en forma alguna.

**IV.4.** Que para todos los efectos legales relacionados con el presente **"CONVENIO ESPECÍFICO"** señala como domicilio el ubicado en Navarro sin número entre Altamirano y Gómez Farías, colonia Centro, municipio de La Paz, Baja California Sur, código postal 23000 (Anexo al Centro Cultural Jesús Castro Agúndez).

**V.   DECLARAN "LA PARTES":**

**V.1.** Que se reconocen mutuamente la personalidad con la que comparecen por conducto de sus representantes legales, para suscribir el presente **"CONVENIO ESPECÍFICO"**.

**V.2.** Que en la celebración del presente instrumento jurídico no existe error, dolo, mala fe o cualquier otro vicio del consentimiento que pudiera invalidarlo.

**V.3.** Que manifiestan su voluntad de suscribir el presente **"CONVENIO ESPECÍFICO"** para conjuntar esfuerzos, acciones y recursos que permitan incidir de manera directa para la realización de la importante tarea de retirar redes de pesca que han sido perdidas o abandonadas por pescadores en la zona marina de la Reserva de la Biósfera Alto Golfo de California y Delta del Río Colorado, que se les conoce como redes fantasma, para evitar el enmalle, daño o muerte de especies tan importantes como la vaquita marina o la totoaba consideradas especies en riesgo, por lo que otorgan su consentimiento para la suscripción del mismo.

En virtud de lo anterior y con fundamento en los artículos 4° párrafo quinto  26 y 90 de la Constitución Política de los Estados Unidos Mexicanos; 2 fracción I, 17, 26, 30 y 32 Bis de Ley Orgánica de la Administración Pública Federal; 2 fracción IV Bis de la Ley Orgánica de la Armada de México; 5, 6, 46 fracción III, 47, 50, 51, 161, 157 y 158 fracción II de la Ley General del Equilibrio Ecológico y la Protección al Ambiente; 7 fracciones X y XI del Reglamento Interior de **"LA SEMAR"**; 1, 2 fracción XXXI, inciso a), 41, 42, 43, 45 y 46, del Reglamento

6



 

Interior de **"LA SEMARNAT";** y con los estatutos de **"MUSBALL"** y **"LA ORGANIZACIÓN",** las partes celebran el presente **"CONVENIO ESPECÍFICO"** al tenor de las siguientes:

## CLÁUSULAS

**PRIMERA. OBJETO. -** El objeto del presente "CONVENIO ESPECÍFICO", consiste en la localización y el reporte para retirar **"LAS REDES"** que han sido pérdidas o abandonadas por pescadores, en la zona marina de la Reserva de la Biósfera Alto Golfo de California y Delta del Río Colorado, ubicada en aguas del Golfo de California y los Municipios de Mexicali, Baja California, Puerto Peñasco y San Luis Río Colorado, Sonora, que permita incidir de manera directa para evitar el enmalle, daño o muerte de especies tan importantes como la vaquita marina o la totoaba, consideradas especies en riesgo, para lo cual **"LAS PARTES"** convienen las características y especificaciones plasmadas en el presente Convenio.

**SEGUNDA. DEL CRONOGRAMA DE ACTIVIDADES.-.** Para el cumplimiento del objeto del presente Convenio, **"LAS PARTES",** acuerdan en brindarse el apoyo material y humano que se requiera para las acciones derivadas del presente instrumento, y formular de manera conjunta el cronograma de actividades que deben realizarse para el retiro de **"LAS REDES"** en la zona marina de la Reserva de la Biósfera del Alto Golfo de California, el cual deberá contener al menos los siguientes elementos:

Acciones, fechas de su realización, responsables, presupuesto, equipo, vehículos y demás características y especificaciones que acuerden **"LAS PARTES",** de conformidad con las disposiciones jurídicas aplicables.

**TERCERA. DE LOS COMPROMISOS DE LAS PARTES. - "LAS PARTES"** convienen sujetarse a los siguientes compromisos:

**"LA SEMAR"** se compromete a realizar las siguientes acciones dentro de sus prioridades operativas y sin afectar otras operaciones que se encuentre desarrollando:

a) Brindar la información correspondiente para la localización, arrastre y destrucción de **"LAS REDES"** en coordinación con **"LA PROFEPA"** y otras autoridades competentes en materia ambiental.

b) Coordinar con **"LAS PARTES"** las acciones operativas para el cumplimiento del objeto del presente instrumento y que se programen de acuerdo al "cronograma de actividades" que se estipula en la cláusula segunda.

7



 

**c)** Dar atención a la solicitud de **"LA ORGANIZACIÓN"** y del **"MUBABCS"**, en el marco de sus prioridades operativas y sin afectar otras operaciones que se encuentre desarrollando, para contar con presencia de su personal a bordo de las embarcaciones de **"LA ORGANIZACIÓN"** y del **"MUBABCS"**, cuando éstas estimen que existen circunstancias que comprometen la seguridad de su personal o de dichas embarcaciones.

**"LA PROFEPA"** se compromete a realizar las siguientes acciones:

**a)** Brindar la información correspondiente para la localización, arrastre y destrucción de **"LAS REDES"**.

**b)** Establecer los procesos o métodos para el transporte, acopio y destrucción de **"LAS REDES"**, que serán aplicados por **"LA ORGANIZACIÓN"** y **"MUBABCS"**.

**"LA ORGANIZACIÓN"** se compromete a realizar las siguientes acciones:

**a)** Brindar la Información correspondiente y aportar los recursos de que disponga, incluso los tecnológicos, para la localización, arrastre y destrucción de **"LAS REDES"**;

**b)** Recoger y subir a bordo de sus embarcaciones, **"LAS REDES"** abandonadas que localice en el curso de las actividades a que se refiere el presente **"CONVENIO ESPECÍFICO"**;

**c)** Una vez a bordo, llevar a cabo el proceso de desmantelamiento o destrucción de **"LAS REDES"**, para su entrega al centro de acopio correspondiente;

**d)** En caso de encontrar entre **"LAS REDES"** especímenes muertos de totoaba, subirlos a bordo de sus embarcaciones para el efecto de destruir el ejemplar completo, sin extraer vísceras, disponiendo de él en el mar, tras recabar la evidencia en video de dicho proceso, mismo que deberá entregar a **"LA PROFEPA"** con base a lo dispuesto en la Cláusula Segunda del **"CONVENIO DE CONCERTACIÓN"**, suscrito con fecha 17 de mayo del 2017;

**e)** Informar por el medio más expedito de comunicación a su alcance y sin dilación, tanto a **"LA SEMAR"** como a **"LA PROFEPA"**, respecto a actividades que identifique en el curso de las acciones de las que se presuma no están permitidas por las disposiciones legales aplicables, incluso:

    **i.** Las redes que identifique a bordo de cualquier embarcación menor;

8



 

ii.  Embarcaciones menores que identifique que lleven a bordo las especies en riesgo a que se refiere este **"CONVENIO ESPECÍFICO"**;

iii.  El presente apartado no otorga facilidades de retención, ni de inspección de embarcaciones en materia pesquera, quedando dicha prerrogativa exclusivamente a cargo de las autoridades competentes del estado mexicano.

Los informes a **"LA PROFEPA"** deben realizarse con base a lo dispuesto en la Cláusula Segunda del **"CONVENIO DE CONCERTACIÓN"**, suscrito con fecha 17 de mayo del 2017.

f)  Solicitar a la **"SEMAR"** la presencia de personal de la misma, a bordo de las embarcaciones de la **"ORGANIZACIÓN"**, cuando ésta estime que existen circunstancias que comprometen la seguridad de su personal o de dichas embarcaciones, a lo cual la **"SEMAR"** dará atención, en el marco de sus prioridades operativas y sin afectar otras operaciones que se encuentre desarrollando.

**"MUBABCS"** se compromete a realizar las siguientes acciones:

a)  Brindar la información correspondiente y aportar los recursos de que disponga, incluso los tecnológicos, para la localización, arrastre y destrucción de **"LAS REDES"**;

b)  Recoger y subir a bordo de sus embarcaciones, **"LAS REDES"** abandonadas que localice en el curso de las actividades a que se refiere el presente **"CONVENIO ESPECÍFICO"**;

c)  Una vez a bordo, llevar a cabo el proceso de desmantelamiento o destrucción de **"LAS REDES"**, para su entrega al centro de acopio correspondiente;

d)  En caso de encontrar entre **"LAS REDES"** especímenes muertos de totoaba, subirlos a bordo de sus embarcaciones para el efecto de destruir el ejemplar completo, sin extraer vísceras, disponiendo de él en el mar, tras recabar la evidencia en video de dicho proceso, mismo que deberá entregar a la **"PROFEPA"**;

e)  Informar por el medio más expedito de comunicación a su alcance y sin dilación, tanto a la **"SEMAR"** como a la **"PROFEPA"**, respecto a actividades que identifique en el curso de las acciones de las que se presuma no están permitidas por las disposiciones legales aplicables, incluso:

9



 

i. Las redes que identifique a bordo de cualquier embarcación menor;

ii. Embarcaciones menores que identifique que lleven a bordo las especies en riesgo a que se refiere este **"CONVENIO ESPECÍFICO"**; y

iii. El presente apartado no otorga facilidades de retención, ni de inspección de embarcaciones en materia pesquera, quedando dicha prerrogativa exclusivamente a cargo de las autoridades competentes del estado mexicano.

f) Solicitar a la **"SEMAR"** la presencia de personal de la misma, a bordo de las embarcaciones del **"MUBABCS"**, cuando ésta estime que existen circunstancias que comprometen la seguridad de su personal o de dichas embarcaciones, a lo cual la **"SEMAR"** dará atención, en el marco de sus prioridades operativas y sin afectar otras operaciones que se encuentre desarrollando.

**CUARTA. VIGENCIA.** – El presente **"CONVENIO ESPECÍFICO"** entrará en vigor el día de su suscripción y permanecerá vigente por tiempo indefinido.

**QUINTA. NO RELACIÓN LABORAL.** – El personal comisionado, contratado, designado o utilizado por cada una de **"LAS PARTES"** para la instrumentación, ejecución y operación del presente **"CONVENIO ESPECÍFICO"**, continuará bajo la dirección y mando de la dependencia, sociedad o asociación a la que pertenezcan, por lo que en ningún caso y bajo ningún motivo la contraparte podrá ser considerada patrón sustituto o solidario, quedando liberada de cualquier responsabilidad laboral, administrativa, fiscal, judicial y sindical que llegara a suscitarse.

**SEXTA. ACTUACIÓN DE "LAS PARTES".-** Nada en este instrumento será considerado o interpretado para constituir a **"LAS PARTES"** como socios, agentes o empleados uno del otro, y ninguna de las disposiciones del presente documento será interpretada para responsabilizar a la otra Parte por las deudas, responsabilidades y compromisos de la contraparte.

Ninguna de **"LAS PARTES"** podrá emprender o realizar acción alguna de cualquier naturaleza, o asumirá compromisos o responsabilidades en nombre de la otra, excepto por lo expresamente señalado o permitido conforme a los términos de este **"CONVENIO ESPECÍFICO"**, de lo contrario se hará acreedor a las sanciones administrativas y penales que correspondan.

**SÉPTIMA. GRUPO DE EVALUACIÓN Y SEGUIMIENTO. -** Para el adecuado desarrollo de las actividades contenidas en el presente **"CONVENIO ESPECÍFICO"** que se generen con motivo de su cumplimiento, se conformará

10



 

un grupo de evaluación y seguimiento, el cual facilitará la comunicación entre **"LAS PARTES"**, en consecuencia, estas designan como sus responsables de dicho grupo a las siguientes personas:

Por "**LA SEMAR"**, al Jefe de la Subsección de Protección Civil, Contingencias y Medio Ambiente de la Sección de Operaciones del Estado Mayor General de la Armada.

Por **"LA PROFEPA"**, al Director General de Inspección y Vigilancia de Vida Silvestre, Recursos Marinos y Ecosistemas Costeros.

Por **"LA ORGANIZACIÓN"**, al Director de Operaciones y Campañas Marinas.

Por **"MUBABCS"**, al Director Operativo.

Dicho grupo se conformará en un plazo no mayor a treinta días naturales a partir de la firma del **"CONVENIO ESPECÍFICO"** y tendrá como finalidad establecer los canales institucionales de comunicación entre **"LAS PARTES"**, sesionará semestralmente de manera cotidiana y extraordinariamente cuando así se requiera por la gravedad o importancia del asunto a tratar. Los miembros designados para este grupo podrán ser sustituidos siempre que para ello se dé aviso a las demás partes con una anticipación mínima de cinco días naturales.

**OCTAVA. ADHESIÓN AL CONVENIO. – "LAS PARTES"** acuerdan que con el propósito de sumar a otras dependencias del Ejecutivo Federal y a personas físicas o morales nacionales o extranjeras con representación en México, se podrá incorporar a estas mediante convenios de adhesión bajo las mismas prerrogativas y compromisos contenidas en el presente instrumento jurídico.

**NOVENA. DE LA PROPIEDAD INTELECTUAL Y DERECHOS DE AUTOR. – "LAS PARTES"** convienen de manera expresa que los trabajos que se deriven de la ejecución del presente **"CONVENIO ESPECÍFICO"** y que sean susceptibles de protección intelectual, corresponderán a la parte cuyo personal haya realizado el trabajo objeto de protección, dándole el debido reconocimiento a quien hayan intervenido en la realización del mismo, conforme a las disposiciones jurídicas aplicables a la materia.

**DÉCIMA. CONFIDENCIALIDAD.- "LAS PARTES"** acuerdan que todo su personal guardará estricta confidencialidad con respecto a la información que sea de su conocimiento, y les haya sido proporcionada por cualquiera de **"LAS PARTES"** para el cumplimiento del objeto del presente instrumento y se comprometen a no divulgar en ninguna forma a personas ajenas al cumplimiento de dicho objeto, sin la autorización previa y por escrito de las partes que la haya proporcionado, quedando bajo su más estricta responsabilidad el mal uso o divulgación que pudiera hacer de ésta por causas imputables a él o a su personal,

11



 

salvo la información clasificada para conocimiento general conforme a la ley de la materia.

No obstante lo anterior, **"LAS PARTES"** se sujetarán a lo previsto en la legislación aplicable a cada una de ellas en materia de transparencia y acceso a la información pública.

**DÉCIMA PRIMERA. MODIFICACIONES.** – El presente **"CONVENIO ESPECÍFICO"** podrá ser modificado o adicionado total o parcialmente por acuerdo de **"LAS PARTES"**, en los términos previstos por los mismos. Las modificaciones o adiciones deberán constar en acuerdo escrito y formarán parte del presente instrumento mediante el documento que para tal efecto se suscriba.

**DÉCIMA SEGUNDA. TERMINACIÓN ANTICIPADA.** – **"LAS PARTES"** acuerdan que cualquiera de ellas podrá dar por terminada anticipadamente su participación en el **"CONVENIO ESPECÍFICO"**, mediante notificación escrita que realice cualquiera de **"LAS PARTES"**. Tal notificación deberá realizarse con treinta días naturales anteriores a la fecha en que se pretende dejar de colaborar.

**DÉCIMA TERCER. CASO FORTUITO Y FUERZA MAYOR.** – Ninguna de **"LAS PARTES"** será responsable de cualquier retraso e incumplimiento en la realización del **"CONVENIO ESPECÍFICO"**, que resulte directa o indirectamente de caso fortuito o fuerza mayor. En caso de que desaparezcan las causas que dieron origen al retraso o incumplimiento referido se reactivará la ejecución del presente instrumento.

**DÉCIMA CUARTA. INTERPRETACIÓN Y CONTROVERSIAS.** – **"LAS PARTES"** manifiestan que el presente **"CONVENIO ESPECÍFICO"** es producto de la buena fe por lo que se realizarán todas las acciones necesarias para su debido cumplimiento. En caso de suscitarse duda o controversia respecto de la interpretación y cumplimiento del presente **"CONVENIO ESPECÍFICO"**, **"LAS PARTES"** acuerdan resolver dicha duda o controversia mediante la conciliación y buena fe. En caso de persistir dicha duda o controversia se someterán a la jurisdicción y competencia de los Tribunales Federales de la Ciudad de México.

**DÉCIMA QUINTA. DE LA TRANSPARENCIA Y RENDICIÓN DE CUENTAS.** – **"LAS PARTES"** convienen en brindarse todo el apoyo y auxilio suficiente para atender los requerimientos de cualquier ciudadano que, mediante solicitud en el Portal de Transparencia de las dependencias participantes, solicite copia, datos o información derivado del presente instrumento para atender en tiempo y forma dicha solicitud de conformidad con las disposiciones jurídicas aplicables.

Enteradas **"LAS PARTES"** del contenido y alcance legal del presente **"CONVENIO ESPECÍFICO"**, lo firman en siete tantos originales a los _____ del mes de _____ de 2018.

12





**SEMAR**
SECRETARÍA DE MARINA

**POR "LA SEMAR"**

**EL OFICIAL MAYOR**

**ALMIRANTE**
**JOSÉ LUIS VERGARA IBARRA**

**PROFEPA**
PROCURADURÍA FEDERAL DE
PROTECCIÓN AL AMBIENTE

**POR "LA PROFEPA"**

**EL PROCURADOR FEDERAL DE**
**PROTECCIÓN AL AMBIENTE**

**GUILLERMO JAVIER HARO**
**BÉLCHEZ**

**JEFE DE LA SECCIÓN DE**
**OPERACIONES**

**CONTRALMIRANTE**
**JOSÉ IGNACIO MORENO DÍAZ**

**POR "LA ORGANIZACIÓN"**

**EL PRESIDENTE**

**PAUL WATSON**

**DIRECTOR DE OPERACIONES Y CAMPAÑAS MARINAS**

**LOCKHART MACLEAN**

LA PRESENTE HOJA DE FIRMAS CORRESPONDE AL CONVENIO ESPECÍFICO DE COLABORACIÓN PARA EL RETIRO DE REDES FANTASMA EN EL ÁREA NATURAL PROTEGIDA, CON EL CARÁCTER DE RESERVA DE LA BIÓSFERA, ALTO GOLFO DE CALIFORNIA Y DELTA DEL RÍO COLORADO, QUE SUSCRIBEN "LA SEMAR"; "LA SEMARNAT", A TRAVÉS DE "LA PROFEPA"; "LA ORGANIZACIÓN" Y "MUBABCS", EL DÍA _____ DE _____ DE 2018.



https://outlook.live.com/mail/sentitems/id/AQMkADAwATYwM...



https://outlook.live.com/mail/sentitems/id/AQMkADAwATYwM...



AVISO DE ZARPE DE CABOTAJE

CAPITANIA DE PUERTO                         Puerto Chiapas, Chiapas, México a 23 DE FEBRERO DE 2018

PRESENTE

Capitán del yate, o velero de placer denominado "SHARPIE" con matrícula "50925" del puerto de "PORTSMOUTH." De el porte de "174" toneladas brutas y de "52" toneladas de arqueo neto procedente de "PUERTO CHIAPAS" Declara  el día de hoy su zarpe con destino A "SAN FELIPE, B.C. " Y puertos intermedios en caso necesario, con la siguiente tripulación.

| No. | Nombre | Nacionalidad | Cargo a bordo | Edad |
|---|---|---|---|---|
| 1 | FRANCOIS JOSEPH ROGER MARTIN | FRANCIA | CAPITÁN | 38 |
| 2 | CONSTANCE JUNE SANCHEZ | USA | TRIPULACION | 63 |
| 3 | NICOLAE MODREA | USA | TRIPULACION | 67 |
| 4 | MARTINA CERNA | REPUBLICA CHECA | TRIPULACION | 26 |
| 5 | TJEERD JURIEN BUIS | HOLANDA | TRIPULACION | 25 |
| 6 | JEROLD PHILIP HUEBNER | USA | TRIPULACION | 47 |
| 7 | REBECCA HOLLADAY ALLEN | USA | TRIPULACION | 17 |
| 8 | JOSE PABLO ISAZA JARAMILLO | COLOMBIA | TRIPULACION | 30 |
| 9 | FRANCOIS VAN SULL | BELGICA | TRIPULACION | 18 |
| 10 | TAMARA ARENOVICH | CANADA | TRIPULACION | 43 |
| 11 | MATTHEW JAMES PARKIN | GRAN BRETAÑA | TRIPULACION | 26 |
| 12 | BENJAMIN JACK RUTLEDGE GIBBS | AUSTRALIA | TRIPULACION | 18 |
| 13 | JONATHAN DREW MOYNIHAN | USA | TRIPULACION | 32 |

Comprende este rol los asientos de "13" personas y es de mi satisfacción como capitán que soy, manifestar que me obligo al exacto cumplimiento de todo cuanto dispone las leyes reglamentos actualmente en vigor.

SEMAR

★  05 MAR 2018  ★                              Atentamente

R E C I B I D O
DIECISIOCHO DE MARZO              Capitán del Yate o Velero de placer
CAPITANIA DE PUERTO

Habiendo cumplido su escala en este puerto la embarcación denominada " SHARPIE " con esta fecha despáchese para "SAN FELIPE, B.C. " Y puertos intermedios, si fuere necesario.

ATENTAMENTE

PILOTO NAVAL VERONICA MUÑOZ JIMÉNEZ

CAPITAN DE PUERTO REGIONAL

10/04/2019 03:22 p. m.



★ 17 ABR 1918
R E C I B I D O
GESTION DE TRAMITES



# SHARPIE

| | |
|---|---|
| Last Port | San Felipe BCS Mexico |
| Port of Arrival | San Felipe BCS Mexico |
| Port Of Registry | Portmouth, DOMINICA |
| O.N | 50925 |
| IMO | 1010399 |
| GRT | 174 |
| CREW | |

| Owner | Sea Shepherd Conservation Society |
|---|---|
| Captain | David Evans |

| Name | DOB | Nationality on Passport | Place of Birth | Passport No. | Expiry | Place of Issue | Position |
|---|---|---|---|---|---|---|---|
| David Evans | 07/06/74 | British | Truro | 761208875 | 11/19/18 | FCO | Captain |
| Jonathan Moynihan | 10/28/85 | American | California | 480415527 | 02/14/21 | U.S. DoS | 1st Mate |
| Constance Snchez | 24/12/54 | American | Colorado | 514940659 | 03/05/24 | U.S. DoS | 2nd Mate |
| Stephen Ward | 09/07/80 | Australian | Gosford | N4880266 | 14/01/2023 | AUSTRALIA | Ch ENG |
| Sean Comstock | 06/08/69 | American | Missouri | 460457672 | 22/8/19 | U.S. DoS | Asst ENG |
| Neil Henderson | 00/07/61 | British | Nottingham | 707733952 | 21/03/21 | FCO | Asst ENG |
| Mark Crowder | 03/12/79 | British | Chatham | 519992646 | 05/13/24 | IPS | Bosun |
| François Van Sull | 30/01/2000 | Belgian | Ottignies | EN582422 | 27/12/20 | OTTIGNES | Deck |
| Jose Isara Jaramillo | 16/12/87 | Columbian | Bogota | AN964851 | 08/30/22 | BTA CALLE 100 | Deck |
| Jessica Banderas Pires | 27/10/81 | España | Connecticut | 430868417 | 08/26/17 | USA Dept of State | Deck |
| Eva Hidalgo Pla | 14/11/89 | España | Barcelona | AAJ141725 | 05/05/19 | DGP-08055L6P1 | Deck |
| Tamara Arenovich | 29/5/74 | Canada | Etobicoke | HB522390 | 17/12/24 | TORONTO | Media |
| Erell Ouin | 08/07/94 | Française | Loudéac | 13CV17149 | 17/10/23 | SAINT BRIEUC | CHEF |
| Brian Bojonell | 20/07/85 | American | Ohio | 483302313 | 25/08/21 | U.S. DoS | Deck |

I certify that this above list is true and correct to the best of my knowledge, and I will report any change to
this list to the proper authority as required by the applicable rules and regulations

Signed _____





https://outlook.live.com/mail/sentitems/id/AQMkADAwATYwM...



## MCY SHARPIE

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Last Port | San Felipe BC Mexico | | | Departure Date | | | |
| Port of Arrival | San Felipe BC Mexico | | | Arrival Date | | | |
| Port Of Registry | Portsmouth, DOMINICA | | | Owner | | Sea Shepherd Conservation Society | |
| O.N | 50925 | | | Captain | | Nicholas Bohnet | |
| IMO | ( | | | | | | |
| GRT | 174 | | | | | | |

CREW

| Name | DOB | Nationality on Passport | Place of Birth | Passport No. | Expiry | Place of Issue | Position |
|---|---|---|---|---|---|---|---|
| Nicholas Bohnet | 16/12/1968 | British | Dartmouth | S387977397 | 11/06/2028 | HMPO | Captain |
| Jacqueline La Duc | 16/03/1989 | USA | New York | 464449615 | 01/04/2020 | USA Dept of State | 1st Mate |
| François Van Sull | 30/01/2000 | Belge | Ottignies | EN582422 | 27/12/2020 | OTTIGNIES | 2nd Mate |
| Oleg Symonenko | 5/9/1986 | Ukraine | UKR | ER219446 | 27/02/2024 | 0502 | Ch ENG |
| Carlos Olivares | 12/08/1987 | Mexicana | Tamaulipas | G31764236 | 19/10/2026 | BAJA CALIFORNIA SUR | 2nd ENG |
| Samuel Diguin | 23/02/1996 | Mexicana | Veracruz-Llave | G15832954 | 04/03/2026 | TAMAULIPAS | 3rd ENG |
| Willie Hatfield | 29/07/1985 | USA | Minnesota | 545356819 | 13/06/2026 | USA Dept of State | Bosun |
| Benjamin Gouin | 06/10/1986 | Francaise | Neuchatel | 16AF25584 | 14/02/2026 | Prefecture des Bouche | Bosun's ma |
| Samuel Mansfield | 26/08/1994 | Canadian | London | AC549549 | 24/11/2027 | London | Deck |
| Holladay Allen | 11/08/1980 | USA | Florida | 519806496 | 13/10/2024 | USA Dept of State | Chef |
| Tamara Aranovich | 29/05/1974 | Canadian | Etobicoke | HB527390 | 17/12/2024 | TORONTO | Media |
| Sara Amezqurita | 27/11/1986 | Mexicana | San Luis Potosi | G12612319 | 01/10/2019 | TLALPAN | Scientist |

I certify that the above list is true and correct to the best of my knowledge, and I will report any change to this list to the proper authority as required by the applicable rules and regulations

Signed_____   Date_____

**M/V SHARPIE**
Port of Registry: Portsmouth
Official Number: 50925

TRANSLATION TO SPANISH TO ENGLISH

SPECIFIC COLLABORATION AGREEMENT FOR THE REMOVAL OF PHANTOM NETS, HEREINAFTER REFERRED TO AS "LAS REDES" IN THE NATURAL PROTECTED AREA WITH BIOSPHERE RESERVE STATUS, UPPER GULF OF CALIFORNIA AND COLORADO RIVER DELTA, WHICH IS LOCATED AR THE WATERS OF GULF OF CALIFORNIA AND THE TOWNS OF MEXICALI, BAJA CALIFORNIA, PUERTO PENASCO AND SAN LUIS RIO COLORADO, SONORA, SIGNED BY SECRETARIA DE MARINA ADMIRAL OF THE GENERAL STAFF DIPLOMATIC CORPS, JOSE LUIS VERGARA IBARRA, ASSISTED BY THE CO-ADMIRAL STAFF DIPLOMATIC CORPS, JOSE IGNACIO MORENO DIAZ, IN HIS CAPACITY AS CHIEF OF OPERATIONAL SECTION OF THE GENERAL STAFF OF THE NAVY, HEREINAFTER REFERRED TO AS " SEMAR", SECRETARIA DE MEDIO AMBIENTE Y RECURSOS NATURALES, HEREINAFTER REFERRED TO  AS "SEMARNAT", BY THE PROCURADOR FEFERAL DE PROTECCION AL AMBIENTE, GUILLERMO JAVIER HARO BELCHEZ, HEREINAFTER REFERRED TO AS "LA PROFEPA", THE SOCIETY OF SEA SHEPHERD CONSERVATION SOCIETY, LEGALLY REPRESENTED BY ITS PRESIDENT AND EXECUTIVE OFFICER, PAUL WATSON, WITH THE PARTICIPATION OF LOCKHART MACLEAN, OPERATIONAL CHIEF AND MARINE CAMPAIGNS, HEREINAFTER REFERRED TO AS "THE SOCIETY" AND THE MUSEO BALLENERO DE BAJA CALIFORNIA SUR, A.C. LEGALLY REPRESENTED BY FRANCISCO JAVIER GOMEZ DIAZ, HEREINAFTER REFERRED TO AS "MUBABCS", WHO AS A WHOLE SHALL BE REFERRED TO AS "THE PARTIES", UNDER THE FOLLOWING BACKGROUND, STATEMENTS AND CLAUSES:

## BACKGROUND

I. An Executive Order was published on the Official Journal of the Federation, dated on June 10 of 1991 on which a natural protected area is declared as biosphere reserve on the area known as Upper Gulf of California and Colorado River Delta, located at the waters of Gulf of California and the towns of Mexicali, Baja California, Puerto Penasco, and San Luis Rios Colorado, Sonora, for having a unique biological value since representative fauna of the zoogeographic zone of East Pacific, the Caribbean and  the Province of California is found there, which where there are marshes and freshwater outcrops in the coastal strip and permanent wetlands representative of the old delta of the Colorado River, such as the Santa Clara and El Doctor marshes; there is vegetation of great value for its biodiversity, biological richness and high productivity, breeding and

spawning areas of important marine species, also is the habitat for local and migratory birds. This region is also home to endemic and endangered marine and terrestrial frog species, such as the vaquilla marina, the totoaba, the yuma clapper rail, the sonoran desert dogfish, among others.

II. On September 25, 2009, a notice was published in the official journal of the federation, informing the general public that the national commission of protected areas has concluded the preparation of the Management Program for the Upper Gulf of California and Colorado River Delta Biosphere Reserve, located in the waters of the Gulf of California and the towns of Mexicali, State of Baja California, and Puerto Penasco and San Luis Colorado, State of Sonora.

III. On July 21, 2014 **"SEMAR"** AND **"SEMARNAT"** signed the **"FRAMEWORK COLLABORATION AGREEMENT"** to establish the general bases and mechanisms, through which cooperation actions will be implemented for the execution of inspection and surveillance acts in the national territory, aimed at ensuring the effective compliance and observance of environmental legislation, to prevent and avoid negative effects on the environment and natural resources.

IV. On May 17, 2017 **"PROFEPA"** AND **"THE SOCIETY"** signed a **"CONCERTATION AGREEMENT"** through which the bases and mechanisms of collaboration are established in order to promote and implement actions for the protection and conservation of wildlife as well as technical assistance for the rescue, reception, release and, if necessary, destruction of the corpses of wildlife species, victims of poaching activities.

## DECLARATIONS

### I. **" SEMAR" DECLARES:**

I.1. That it is an agency of the federal executive, forming part of the federal public administration, in accordance with the provisions of Article 90 of the Political Constitution of the United Mexican States and articles 1, 2, 26 and 30 of the Organic Law of the Federal Public Administration.

I.2. That for all legal purposes related to this specific collaboration agreement, hereinafter referred to as the "SPECIFIC AGREEMENT", its address is the one located at Avenida Heroica Escuela Naval Militar Number 861, Colonia Los Cipreses, Delegacion Coyoacan. Zip Code 04830, in Mexico City.

2

I.3 That under the **"FRAMEWORK COLLABORATION AGREEMENT"** it is in the interest of "**SEMAR"** to cooperate with **"THE PARTIES"** in the activities of removal of "LAS REDES" abandoned within the Biosphere Reserve of the Upper Gulf of California and the Colorado River Delta, in order to avoid the entanglement, damage or death of species as important as the vaquita or the totoaba, considered species at risk.

I.4. In accordance with the provisions of article 8 section XII of the internal regulations of **"SEMAR"**, the Admiral of the General Corps, general staff diplomate, Jose Luis Vergara Ibarra, in his capacity as Senior Officer of **"SEMAR",** is empowered to enter into Agreements and Contracts to which the Agency is a party.

## II. THE "PROFEPA" DECLARES

II.1. That **"SEMARNAT"** is an agency of the federal Public Administration which is responsible, in accordance with articles 26 and 32 Bis of the Organic Law of the Federal Public Administration, for promoting the protection, restoration and conservation of ecosystems, natural resources, environmental goods and services, in order to promote their use and sustainable development, as well as formulating and conducting national policy on natural resources, provided that they are not expressly entrusted to another agency; as well as in matters of ecology, environmental sanitation, water, environmental regulation of urban development and fishing activities, with the participation of other agencies and states.

II.2. That it is a Deconcentrated Organism of **"SEMARNAT"** in accordance with the articles 1, 2 section XXXI, subsection a) and article 45 of the Internal Regulation of the above mentioned regulation, to which is granted among others, the faculty to program, to order and to carry out visits or inspection operations, to watch and to evaluate the fulfillment of the applicable legal dispositions to the restoration of the natural resources, the preservation and protection of forest resources, wildlife, chelonians, marine mammals, aquatic species at risk, their ecosystems and genetic resources, biosafety of genetically modified organisms, exotic species that threaten ecosystems, habitats or species, the use and exploitation of natural resources, and the protection of the environment of the Federal maritime-terrestrial zone, maritime beaches and land reclaimed from the sea or any other deposit of marine waters, protected natural areas, prevention and control of atmospheric pollution, soils contaminated by hazardous materials and waste, highly hazardous activities, hazardous waste, environmental impact, emission and transfer of pollutants, wastewater discharges to national water bodies, ecological management and environmental auditing, in accordance with applicable provisions; as well as to establish policies and administrative guidelines for such effect, in addition to safeguarding the interests of the population, stimulating and

3

promoting its participation in the surveillance and compliance with the environmental legal dispositions, as well as to provide legal advice in matters of protection and defense of the environment within the scope of its competence and to help in the solution of problems caused by environmental emergencies or contingencies.

II.2.1 That the Federal Attorney for Environmental Protection, **Guillermo Javier Haro Belchez**, is empowered to sign this collaboration agreement in accordance with articles 41, 42, 43 and 45 section XXXIV of the Internal Regulations of **"SEMARNAT".**
That for all the legal effects related to the specific agreement, the following address is indicated as domicile
II.2.2. That under the protection of the **"COLLABORATION AGREEMENT"** states its address at Camino al Ajusco Number 200 Floor 8, Colonia Jardines de la Montana, Zip Code 14210, Delegacion Tlalpan, in Mexico City.
II.3. It is in the interest of "SEMARNAT"under the effects of the **"COLLABORATION AGREEMENT"**,  to join efforts, actions and resources that allow direct influence to help in the important task of removing fishing nets that have been lost or abandoned by fishermen known as ghost nets in the marine zone of the biosphere reserve of the upper gulf of California and the Colorado River Delta to avoid the damage or death of important species such as the Vaquita and Totoaba, considered species at risk.

## III. THE "SOCIETY" STATES:

III.1. It is an international non-profit organization incorporated in 1977, under the laws of the State of Oregon, United States of America, focused in the conservation of marine life.
III.2. That its corporate purpose is to stop the destruction of half and the slaughter of marine life in the world's oceans in order to conserve and protect ecosystems and species. Which uses innovative direct actions to investigate and document, and takes action when necessary to demonstrate and confront illegal activities at sea safeguarding the biodiversity of the delicate balance of marine ecosystems. **"THE SOCIETY"** works to ensure the survival of marine resources for future generations.
III. 3 That PAUL WATSON recognizes his personality as president and executive director since April 6, 2016 through the certificate provided by Peter Rysman, Attorney of the Organization, dated on March 27, 2017 in the state of Florida, United States of America, and certified before the notary public KIMBERLY WHITE.
III.4. That PAUL WATSON, identifies himself with his passport issued by the United States of America.
III. 5. That for the fulfillment of the commitments originated from the current **"SPECIFIC AGREEMENT"** the following address: Corregidora numero 18, colonia Tlacopac San Angel, delegacion Alvaro Obregon, Zip Code 01040 in Mexico City is established for serving process and any type of notification.

4

**IV. "MUBABCS STATES:**

IV.1. That it is a Civil Association, created under the laws of the Republic of Mexico under public deed number 28, 568, dated on February 7, 1995 granted before the Notary Public number seven, Hector Castro Castro in the City of La Paz, Baja California, and registered in the Public Registry of Commerce under number 77 of volume "X" (tenth) dated on February 17, 2008.

IV.2. That within its corporate purpose is included the biological research of the spaces in its most relevant and fundamental aspects in order to stimulate support contribute and disseminate the resolution of problems related to cetaceans in Mexico and if possible to intervene in the studies of aspects of interest to the country taking into consideration that the large spaces are distributed in an ecological way and are not secondarily of the same type, but in an ecological way and not secondarily of the same type. The organization of seminars, symposiums, conferences and an annual meeting in which research papers are presented with topics that focus on the resolution of research problems and dissemination of biological issues and histories related to all types of cetaceans as well as their conservation and rational management as a natural resource.

IV.3. That Francisco Javier Gomez Diaz, has the legal powers to celebrate this legal instrument as established on by public deed number 94,410, granted by Héctor Castro Castro, Notary Public number 7 in the City of La Paz, Baja California Sur, and declares under oath that such powers have not been revoked, limited or modified in any way.

IV.4. That for all the legal effects related to the current specific agreement it indicates as the following address: Navarro without Number between Altamirano and Gomez Farias, Colonia Centro, town of La Paz, Baja California Sur, Zip Code 23000 (Next to Centro Cultural Jesus Castro Agundez).

**V. "THE PARTIES" STATE:**

V.1. The parties declare that they mutually acknowledge the legal capacity with which they appear through their legal representatives to sign this **"SPECIFIC AGREEMENT".**

V.2. That the execution of the present legal instrument does not exist error, fraud, bad faith or any other vice of the consent that could invalidate it.

V.3. That they manifest their willingness to sign this "**SPECIFIC AGREEMENT"** to join efforts, actions and resources that will allow them to have a direct impact on the important task of removing fishing nets that have been lost or abandoned by fishermen in the maritime zone of the Upper Gulf of California Biosphere Reserve and the Colorado River Delta that are known as ghost nets to avoid the magic damage or death of such important species as the Vaquita and Totoaba considered species at risk, therefore they grant their consent for the subscription of the same.

That according to article 4, fifth paragraph and articles 26 and 90 of the Political Constitution of the United Mexican States; articles 26,30 and 32 Bis of the Organic Law of the Federal Public Administration, Article 2 section IV Bis of the Organic Law of the Mexican Navy, Articles 5, 6, 46 section III, 47, 50, 51, 161, 157 and 158 section II of the General Law on Ecological Balance and Environmental Protection; Article 7 section X and XI of the Internal Regulation of **"SEMAR";** Articles 1, 2 section XXXI, item a), and articles 41, 42, 43, 45 and 46 of the Internal Regulation of **"SEMARNAT"** and the bylaws of "MUSBALL" and "THE SOCIETY", the parties celebrate the current **"SPECIFIC AGREEMENT"** under the following:

### CLAUSES

FIRST. OBJECTIVE.- The objective of the current "SPECIFIC AGREEMENT" consists of locating and reporting the removal of nets that have been lost or abandoned by fishermen in the marine zone of the Upper Gulf of California Biosphere Reserve and the Colorado River Delta, located in the waters of the Gulf of California, in order to have a direct impact to avoid damage or death of important species such as the Vaquita or the Totoaba, considered species at risk, for which **"THE PARTIES"** agree to the content and specifications set forth in this Agreement.

SECOND. CHRONOGRAM OF ACTIVITIES. For the fulfillment of the objective of the current agreement, **"THE PARTIES"** agree to invent the human material support that is required for the actions derived from the current Instrument and to formulate jointly the chronogram of activities that must be carried out for the removal of **"LAS REDES"** in the marine zone of the biosphere reserve of the upper gulf of California which must contain at least the following elements:

Actions and dates of its realization, responsible, budget, equipment, vehicles and other features and specifications that **"THE PARTIES"** agree in accordance with the applicable legal dispositions.

THIRD. IN THE COMMITMENT OF THE PARTIES. **"THE PARTIES"** agree to be part to the following commitments.

The **"SEMAR"** commits itself to carry out the following actions within its operational priorities and without affecting other operations that it is developing:

a) To provide the corresponding information for the location, dragging and destruction of **"LAS REDES"** in coordination with **"PROFEPA"** and other competent authorities in environmental matters.

6

b) To coordinate with **"THE PARTIES"** the operative actions for the fulfillment of the object of the present instrument and that are programmed according to the "chronogram of activities" that is stipulated in the second clause.

c) Give attention to the request of **"THE SOCIETY"** and **"MUBABCS"** is within the framework of its operational priorities and without affecting other operations that are being developed to have the presence of its personnel on board the vessels of "**THE ORGANIZATION"** and **"MUBABCS"** when it is considered that there are circumstances that compromise the safety of its personnel or such vessels.

**"Profepa"** is committed to carry out the following actions:

a) To offer the corresponding information for the location, dragging and destruction of **"LAS REDES".**

b) To establish the processes or methods for the transport, collection and destruction of **"LAS REDES"** that will be applied by "**THE SOCIETY"** and "**MUBABCS".**

**"THE SOCIETY"** commits to carry out the following actions:

a) To provide the corresponding information and provide the resources available, including technological resources, for the location, hauling and destruction of **"LAS REDES"**.

b) To collect and take on board its vessels the abandoned **"LAS REDES"** that it locates in the application of the activities referred to in the **"SPECIFIC AGREEMENT".**

c) Once on board, to carry out the process of dismantling or destruction of "**LAS REDES"** for their delivery to the corresponding collection center.

d) In case of finding dead specimens of Totoaba among **"LAS REDES",** take them on board their vessels for the effect of destroying the complete specimen without extracting viscera, disposing of the sea after collecting video evidence of said process, which shall be delivered to **"PROFEPA"** based on the "**PROVISIONS"** of the second clause of the agreement signed on May 17, 2017.

e) To Inform by the most expeditious means of communication within its reach and without delay both to **"SEMAR"** and to **"PROFEPA"** according to the activities that it identifies in the application of the actions of which it is presumed are not permitted by the applicable legal dispositions, including:

I. The nets that it identifies on board of any small vessel.

II. Small vessels that it identifies as carrying on board the species at risk referred to in this **"SPECIFIC AGREEMENT".**

III. This section does not grant facilities of retention or inspection of vessels in fishing matters, being this active dog exclusively in charge of the competent authorities of the Mexican State.

The reports to **"PROFEPA"** must be made based on the provisions of the second clause of the "**AGREEMENT"** signed on May 17, 2017.

f) To request to "**SEMAR"** the presence of their personnel, along with **"THE SOCIETY'S"** vessels when it deems that there are circumstances that compromise the safety of its personnel or of such vessels to which the **"SEMAR"** gives attention within the framework of its operational priorities and without affecting other operations that it is carrying out.

**"MUBABCS"** is committed to carry out the following actions

a) To provide the corresponding information and to contribute the available resources, including the technological ones, for the location, dragging and destruction of **"LAS REDES".**

b) To collect and take on board its vessels, "LAS REDES that are abandoned and located during the performing of the activities referred to in this "**SPECIFIC AGREEMENT".**

c) Once on board, to carry out the process of dismantling or destruction of **"LAS REDES"** for delivery to the corresponding collection center.

d) In case of finding dead specimens of tuna among **"LAS REDES",** take them aboard their vessels in order to destroy the complete specimen without removing the viscera, disposing of it at sea after collecting video evidence of said process, which shall be delivered to **"PROFEPA".**

e) To inform by the most expeditious means of communication to its reach and without delay to **"SEMAR"** and **"PROFEPA",** with respect to activities that it identifies in the course of the actions of which it is presumed not to be allowed by the applicable legal dispositions including:

I. The nets that it identifies on board of any small craft

II. Small vessels that it identifies as carrying on board the species at risk to which this "**SPECIFIC AGREEMENT"** refers, and

III. The current section does not grant facilities of retention nor of inspection of boats in fishing matter, being this prerogative exclusively in charge of the competent authorities of the Mexican State.

f) To request to the "**SEMAR"** the presence of its own personnel,  aboard the **"MUBABCS'S"** vessels when it deems that there are circumstances that compromise the safety of its personnel or of said vessels, to which the "**SEMAR"** will give attention within the framework of its operational priorities and without affecting other operations it is carrying out.

8

**FOURTH. VALIDITY.**- This "**SPECIFIC AGREEMENT**" shall be in force on the date of its execution and shall remain in force for an indefinite period of time.

**FIFTH. NO LABOR RELATIONSHIP.-** The personnel commissioned, hired, designated or used by each of "**THE PARTIES**" for the implementation, execution and operation of the specific agreement, will continue under the direction and command of the agency, company or association to which they belong, so that in no case and for no reason may the Counterpart be considered a substitute or joint employer, being released from any labor, administrative, fiscal, judicial and union liability that may arise.

None of "**THE PARTIES**" shall be deemed or construed to constitute the parties as partners, agents or employees of each other, and nothing herein shall be construed to make the other party liable for the debts, liabilities and commitments of the other party. Neither party shall take or perform any action of any nature whatsoever or assume any commitments or liabilities on behalf of the other, except as expressly stated or permitted under the terms of this "**SPECIFIC AGREEMENT**", failing which it shall be subject to appropriate administrative and criminal penalties.

SEVENTH. **EVALUATION AND MONITORING GROUP.** For the adequate development of the activities contained in this "**SPECIFIC AGREEMENT**" that are originated due to its fulfillment, an evaluation and follow-up group will be created, which will ease the communication between "**THE PARTIES**", consequently, designate as their responsible group the following persons:

For "**SEMAR**", to the chief of its civil protection, contingencies and environment section of the operations section of the general staff of the navy.

For "**PROFEPA**", the general director of inspection and surveillance of wildlife, marine resources and coastal ecosystems.

For "**THE ORGANIZATION**", the director of marine operations and campaigns.

For "**MUBABCS**", to the operational director.

This group will be created within 30 calendar days from the signing of the "**SPECIFIC AGREEMENT**" and its purpose will be to establish the institutional communication between "**THE PARTIES**", it will meet every six months on a daily basis and extraordinarily when required due to the seriousness or importance of the matter to be dealt with. The members appointed to this group may be replaced provided that notice is given to the other parties at least five calendar days in advance.

**EIGHTH. ADHESION TO THE AGREEMENT.**- "**THE PARTIES**" agree that for the purpose of joining other federal executive agencies and national or foreign individuals or

legal entities with representation in Mexico, they may be incorporated by means of adhesion agreements under the same prerogatives and commitments contained in this legal instrument.

**NINTH. INTELLECTUAL PROPERTY AND COPYRIGHTS.-** "**THE PARTIES**" expressly agree that the works derived from the execution of this "**SPECIFIC AGREEMENT**" and which are susceptible of intellectual protection, shall correspond to the party whose personnel has carried out the work object of protection, giving due recognition to those who have intervened in the execution of the same and in accordance with the legal provisions applicable to the matter.

**TENTH. CONFIDENTIALITY.** "**THE PARTIES**" agree that all their personnel will keep strict confidentiality with respect to the information that is of their knowledge and has been provided to them by any of the parties for the fulfillment of the object of the present instrument and undertake not to disclose in any way to persons outside the fulfillment of said object without prior written authorization of "**THE PARTIES**" that have provided it, being under their strictest responsibility the misuse or disclosure that could be made of this for causes attributable to them or their personnel, except the information classified for general knowledge according to the law of the matter.

Despite the foregoing, "**THE PARTIES**" shall be regulated to the provisions of the legislation applicable to each of them in matters of transparency and access to public information.

**ELEVENTH.MODIFICATIONS.** This "**SPECIFIC AGREEMENT**" may be modified or added to in whole or in part by agreement of "**THE PARTIES**" under the terms set forth herein. The modifications or additions shall be recorded in a written agreement and shall form part of this instrument by means of the document signed for such purpose.

**TWELFTH.EARLY TERMINATION**. "THE PARTIES" agree that any of them shall request an early termination of the "SPECIFIC AGREEMENT" with a written request by any of "THE PARTIES". The notification shall be given thirty days before the date that is pretended for stopping with the activities.

**THRITEENTH. ACTS OF GOD AND FORCE MAJEURE**. None of "**THE PARTIES**" shall be liable for any delay in the performance of the "**SPECIFIC AGREEMENT**" resulting directly or indirectly from acts of God or force events. If the causes that gave rise to the delay or non-compliance referred to above disappear, the execution of the present instrument shall be activated.
**FOURTEENTH.INTERPRETATION AND CONTROVERSIES.** "**THE PARTIES**" declare that the current "**SPECIFIC AGREEMENT**" is a product of good faith and therefore all the necessary actions will be taken for its due compliance. In the event of any doubt or controversy regarding the interpretation and performance of this "**SPECIFIC AGREEMENT**", "**THE PARTIES**" agree to resolve such doubt or controversy through

10

conciliation and good faith. In case such doubt or controversy persists, they will file a petition to the jurisdiction of the Federal Courts of Mexico City.

**FIFTEENTH. TRANSPARENCY AND ACCOUNTABILITY .-** "**THE PARTIES"** agree to provide each other with all the necessary support and assistance to meet the requirements of any citizen who requests copies, data or information originated  from this instrument through the Portal de Transparencia of the participating agencies, in order to meet such request in due time and form in accordance with the applicable legal provisions.

Once "**THE PARTIES"** are aware of the content and legal scope of this specific agreement, they sign it in seven original copies as follows on  _____ days of _____ moth of 2018

Signed by                                             Signed by
"SEMAR"                                               "PROFEPA"
OFICIAL MAYOR                                         EL PROCURADOR DE
ALMIRANTE                                             PROTECCION           AL
AMBIENTE
JOSE LUIS VERGARA IBARRA              GUILLERMO   JAVIER   HARO
BELCHEZ

Signed by
JEFE DE SECCION DE
OPERACIONES
CONTRALMIRANTE
JOSE IGNACIO MORENO DIAZ

Signed by
"THE SOCIETY"
THE PRESIDENT
PAUL WATSON

Signed by
DIRECTOR DE OPERACIONES Y CAMPALAS MARINAS
LOCKHART MACLEAN

THE CURRENT PAGE OF SIGNATURES BELONGS TO THE SPECIFIC
COLLABORATION AGREEMENT FOR THE REMOVAL OF PHANTOM NETS, IN THE
NATURAL PROTECTED AREA WITH BIOSPHERE RESERVE STATUS, UPPER
GULF OF CALIFORNIA AND COLORADO RIVER DELT, UNDERWRITTEN BY
"SEMAR", "SEMARNAT" THROUGH "THE SOCIETY" AND "MUBABCS", DATED ON
_____ OF _____ OF 2018.

12

Signed by
"MUBABCS"
FRANCISCO JAVIER GOMEZ DIAZ

THE CURRENT PAGE OF SIGNATURES BELONGS TO THE SPECIFIC COLLABORATION AGREEMENT FOR THE REMOVAL OF PHANTOM NETS, IN THE NATURAL PROTECTED AREA WITH BIOSPHERE RESERVE STATUS, UPPER GULF OF CALIFORNIA AND COLORADO RIVER DELT, UNDERWRITTEN BY "SEMAR", "SEMARNAT" THROUGH "THE SOCIETY" AND "MUBABCS", DATED ON _____ OF _____ OF 2018.

13

NOTICE OF DEPARTURE FOR COASTAL FISHING

PORT CAPTAINCY PORT OF CHIAPAS, MEXICO, FEBRUARY 28, 2018

Captain of yatch or pleasure sailboat called "SHARPIE" with registration number "50925" of the port "PORTSMOUTH" of "174" tons and "52" of net tonnage from "PUERTO CHIAPAS" states that today the sailing to "SAN FELIPE" y intermediate ports if needed with the following crew.

| Number | Name | Nationality | Cargo on board | Age |
|--------|------|-------------|----------------|-----|
| 1 | Francois Joseph Roger Martin | France | Captain | 39 |
| 2 | Constance June Sanchez | USA | Crew | 63 |
| 3 | Nicolae Modrea | USA | Crew | 67 |
| 4 | Martina Cerna | Czech Republic | Crew | 26 |
| 5 | Tjeerd Jurjen Buis | Holland | Crew | 25 |
| 6 | Jerold Philip Huebner | USA | Crew | 47 |
| 7 | Rebecca Holladay Allen | USA | Crew | 37 |
| 8 | Jose Pablo Isaza Jaramillo | Colombia | Crew | 30 |
| 9 | Francois Van Sull | Belgium | Crew | 18 |
| 10 | Tamara Arenovich | Canada | Crew | 43 |
| 11 | Matthew James Parkin | Great Britain | Crew | 26 |
| 12 | Benjamin Jack Rutledge Gibbs | Australia | Crew | 18 |
| 13 | Jonathan Drew Moyninhan | USA | Crew | 32 |

This role includes the seats of 13 persons and it is to my satisfaction as the captain that I am to state that I comply with the laws and regulations currently in force.

Sincerely,
Signed by
The Captain of the yatch or pleasure sailboat

The vessel "SHARPIE" completed the call at this port, consequently, with this date dispatches to "SAN FELIPE, B,C." and intermediate ports if necessary.

14

## CERTIFICATE OF TRANSLATION

I, <u>Celeste Licea</u>, am competent to translate from <u>Spanish</u> into English language, and

certify that the translation of this

### Specific Collaboration Agreement

are true and accurate to the best of my abilities.

Signature of translator

Celeste Licea
(Printed name of translator)

I certify under Penalty of Perjury under the laws of the State of California that the foregoing paragraph is true and correct.

CLAUDIA TIRADO
Notary Public - California
San Diego County
Commission # 2302753
My Comm. Expires Aug 24, 2023

Signature of Notary Public Claudia Tirado

(Notary Seal)

15

# EXHIBIT B

3/24/2021                    Collision at Sea as Sea Shepherd Vessels Attacked in Mexico's Vaquita Refuge - Sea Shepherd Conservation Society

Case 2:21-cv-02553-ODW-KS   Document 1   Filed 03/24/21   Page 80 of 83   Page ID #:80



# Collision at Sea as Sea Shepherd Vessels Attacked in Mexico's Vaquita Refuge



*Sea Shepherd and Mexican authorities rescue two assailants whose boat crashed into the conservation vessel Farley Mowat during an aggressive early morning*

*attack against the non-profit environmental group.*



Collision at Sea as Sea Shepherd Vessels Attacked in Mexico's Vaquita Refuge

**SAN FELIPE, BCN, Mexico – Jan. 1, 2021** – At approximately 07:00 on the morning of December 31st, a group of assailants in 5-7 fishing boats (known locally as pangas) launched a violent attack on Sea Shepherd vessels *Farley Mowat* and *Sharpie* inside the Zero Tolerance Area of Mexico's federally-protected Vaquita Refuge.

The incident began as the crew of the *Farley Mowat* undertook efforts to retrieve a gillnet from the protected region, home to the critically endangered vaquita porpoise. Gillnet fishing is banned in the region, and Sea Shepherd is working with Mexican authorities to deter poaching and remove illegal fishing gear from the area. As the conservation vessel attempted to remove the net from the refuge, several pangas aggressively approached the ship, launching lead weights and Molotov cocktails at the crew and military officials on board.

Following routine anti-piracy procedures, the *Farley Mowat* undertook defensive maneuvering to avoid the attacks. As the vessel attempted to leave the scene, one of the pangas aggressively swerved in front of the *Farley Mowat*, crashing directly into the hull of the former U.S. Coast Guard Cutter. CCTV footage recorded on the bridge of the *Farley Mowat* captured images of the incident.

The panga split into two pieces, expelling its passengers into the sea. Crew and military personnel on board Sea Shepherd's second vessel in the area, *Sharpie*, responded immediately, recovered the two men, who had been picked up by one of the other pangas involved in the attack, and brought them on board. Sea Shepherd's Medical Officer, Corrine Perron, provided emergency first aid.

One assailant was not breathing when brought on board the conservation vessel. Sea Shepherd's Medical Officer used the ship's AED and administered immediate CPR and emergency oxygen. The second assailant has suspected broken ribs. Two medics from the Mexican Navy arrived at the scene and provided additional emergency care to the men. As the medics continued to tend to the injured parties, two assailants illegally boarded the *Sharpie*, threatened its crew and the Mexican officials on board, and smashed the camera being used to document the emergency first response. Assailants in nearby pangas threw projectiles and fuel at *Sharpie,* catching its bow on fire. *Sharpie* crew and military officials successfully put out the fire and removed the two men who had illegally boarded the ship. Sea Shepherd rushed the injured men to two nearby naval vessels, a defender and an interceptor, for follow-up medical treatment. They have since been airlifted to the hospital.

As *Sharpie* departed from the scene, the pangas continued to attack, launching additional Molotov cocktails at the vessel, setting the recovered fishing gear collected on the vessel's aft-deck on fire. The crew and military personnel on board were able to extinguish the fire. On shore, assailants set fire to Sea Shepherd's truck.

The Mexican Navy is investigating the incident.

This morning's attack is the latest in a series of increasingly violent assaults launched against Sea Shepherd's ships over the past month. Assailants have hurled Molotov cocktails, knives, hammers, flares, bottles of fuel, and other deadly projectiles at the vessels, crew, and military personnel on board. No serious injuries have occurred prior to today's incident.

The conservation organization's vessels have come under attack in the past while defending the habitat of the vaquita. In March 2020, **a group of pangas swarmed Farley Mowat and Sharpie, launching rocks, lead weights, and other projectiles at the ships**. One month prior, **assailants opened fire at Sea Shepherd's vessels**. In 2019, Farley Mowat was **illegally boarded** and its **hull set on fire**.

The Vaquita Refuge is a UNESCO-recognized region in the Upper Gulf of California that is home to the world's most endangered marine mammal – the vaquita. The endemic porpoise has experienced a rapid population decline over recent years due to **entanglement in gillnets**. There are fewer than 20 vaquitas left alive. Scientists believe the remaining vaquita population is concentrated in a high-priority zone of the Vaquita Refuge known as the Zero Tolerance Area.

Working closely with Mexican authorities, Sea Shepherd monitors the Vaquita Refuge to deter poaching and remove the illegal nets that threaten the survival of the species. This partnership has resulted in the **retrieval of over 1,000 gillnets** to-date.

3/24/2021    Collision at Sea as Sea Shepherd Vessels Attacked in Mexico's Vaquita Refuge | Sea Shepherd Conservation Society

Case 2:21-cv-02553-ODW-KS   Document 1   Filed 03/24/21   Page 83 of 83   Page ID #:83

# Leave a Reply

Enter your comment here...

This site uses Akismet to reduce spam. **Learn how your comment data is processed**.

**Sea Shepherd Conservation Society**